Filed 7/21/14  P. v. Pettress CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056585 |
| v. | (Super.Ct.No. FBA1100128) |
| DUREE PETTRESS et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  John B. Gibson, Judge.  Affirmed.

Raymond M. DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant Duree Pettress.

Patrick Morgan Ford, under appointment by the Court of Appeal, for Defendant and Appellant Lafayette Pettress.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Ronald A. Jakob, Deputy Attorneys General, for Plaintiff and Respondent.

In 1995, T.G., age three, one of five children placed in the defendants' home by child welfare authorities, disobeyed his aunt, defendant Duree Pettress, by eating a piece of pizza, and was stomped to death, while defendant Lafayette Pettress did nothing. T.'s nine-year-old sister Evelyn took the blame for the death, after defendants said they would harm her and her siblings if she implicated them. Evelyn recanted her confession six months later, reporting that Duree had stomped the child to death, but no further investigation took place. In 2011, Evelyn's younger sister J., who had witnessed the stomping, came forward to reopen the case. Charges of murder were filed against each defendant. Following a jury trial, Duree was convicted of second degree murder, while Lafayette was convicted of involuntary manslaughter as a lesser included offense. Duree was sentenced to 15 years to life in prison, while Lafayette was sentenced to serve a term of four years, and both defendants appealed.

On appeal, Duree argues for reversal of the conviction because (1) the prosecution's extraordinary delay in bringing the charges violated her right to due process of law; (2) the admission of Lafayette's statements implicating Duree in the death constituted *Aranda-Bruton*[1] error; (3) admission of evidence of prior child abuse incidents infringed on her fundamental rights; and (4) the cumulative effect of the combined errors resulted in prejudice requiring reversal. Lafayette argues that his conviction should be reversed because the statute of limitations had run on the lesser

---

[1] Referring to *People v. Aranda* (1965) 63 Cal.2d 518, and *Bruton v. United States* (1968) 391 U.S. 123.

2

included offense, and he joins Duree's arguments relating to the pre-charging delay and admission of other child abuse incidents.  We affirm.

## BACKGROUND

Evelyn G. (age 9), and her younger siblings J. (age 6), O. (age 5), T. (age 3), his twin Ja. (age 3), and baby Od., were dependents of the juvenile court.  They were removed from their parents' custody and were placed in the home of Duree and Lafayette Pettress[2] in March 1995, under oversight by Child Protective Services (CPS).  Duree is the biological aunt of the children, the sister of their father.

On the evening of December 6, 1005, Duree and Lafayette ordered pizza. T. and O. had gotten into trouble so they had to stand in the corner of the room on one foot, with their hands in the air, and they were not allowed to have pizza.  This was a typical punishment for the two boys, who were treated more harshly than the girls.

On December 7, 1995, the next morning, T. got up and ate a piece of pizza.  Duree jumped up and grabbed him, and then dragged him into the bathroom.  J. followed Duree to the bathroom.  Duree told T. to spit up the pizza.  Evelyn, who was ironing clothes to wear to school, heard Duree yell about the pizza being eaten and that it should not have been eaten.

T. did not spit up the pizza, so Duree commenced "stomping" him in the stomach, while telling T. to spit it up.  After hearing Duree yell, and hearing the sounds of "stomping" in the bathroom, Evelyn went towards the door to the connecting bathroom

---

[2] To avoid confusion, we will refer to the defendants by their first names.

3

that opened up to the girls' bedroom, while J. was near the bathroom door on the other side.[3] Evelyn saw Duree stomp T. several times, then put him over the toilet and told him to spit up the pizza, and then repeating the process two additional times, until T. went limp. During the incident, Lafayette was laying down in a room. J. turned back at one point and saw Lafayette looking, with a clear view of what was happening in the bathroom, but instead of doing something to stop Duree, he lay back down as if he were sleeping.

After being stomped by Duree, T. defecated on himself and lay lifeless on the bathroom floor. Duree grabbed a black bag and put T.'s soiled clothing inside, then put the bag into a black plastic bag, which she took out to the trash. Evelyn went into the bathroom where T. lay limp; he felt cold, so she wrapped him in a blanket and rocked him in front of a heater. Duree then told the children to get ready for school and told Lafayette to take them to school.

On the way to school, Lafayette told the children that if any of the children told anyone what he or Duree had done, they (the Pettresses) would come and kill them all. Lafayette told Evelyn that she should not blame his wife, and that if anyone asked anything, Evelyn was to say that she (Evelyn) had done it.

After Lafayette had taken the children to school, Duree called 911 to report that her three-year-old nephew was just lying there, not moving, with his eyes rolled back. Emergency personnel and Officer Espinoza responded to the residence where T. appeared

---

[3] The testimony is not entirely clear, but a diagram of the residence was admitted into evidence, showing that the bathroom connected the two bedrooms.

4

to be already dead.  Officer Espinoza observed that T.'s abdomen and stomach were distinctively distended, large, and bloated, and that he had many bruises on his arms, legs, back and sides.

The officer interviewed Duree at the scene and was informed that she, T., Ja., and baby Od. were at home when she called 911, and that her husband (defendant Lafayette) had left already.  Duree told the officer she did not know what was wrong with T.  While Officer Espinoza was at the home, Lafayette and the three older children arrived.  Lafayette informed the officer that Evelyn was always hitting T.  Duree also reported that Evelyn often hit T. and that she had been reprimanded frequently for doing so.

T. was transported to Barstow Community Hospital where, at some point, he was declared dead.[4]  An autopsy was performed on December 12, 1995 by Dr. Duazo.   The external examination of T.'s body revealed he weighed 25 pounds, placing him below the third percentile, the lowest measured percentile for his age.  Dr. Duazo observed bruising on the front of T.'s forehead close to his hairline, along the right side.  She also observed linear scars on his forehead, as well as a round scar.  There was a pinkish contusion above his left eyebrow and, after his scalp was shaved, bruising was found on the right side of his head.  There were several bruises on T.'s extremities, torso and his back, in the lumbar-sacral area.  On the top of T.'s foot, there were scars.  Although the age of the bruises could not be established, they were inflicted at different times.

---

[4] There was no actual witness who testified that T. was declared dead, or when he was declared dead.  However, Officer Espinoza testified that T. appeared to be dead, and Dr. Duazo testified that she performed an autopsy on his body. He was obviously dead at that point.

Additionally, the external examination revealed brownish fecal material on T.'s buttocks, evidence that he had defecated on himself. The defecation might signify that the person was in agony, or that the person had died, since the sphincter muscles relax at death. The pathologist identified five categories of injuries: (1) blunt force head injury; (2) blunt chest injury; (3) blunt abdominal injury; (4) multiple cutaneous contusions; and (5) healed and healing abrasions and contusions to the upper and lower extremities.

The internal examination revealed a small piece of soft, white material, that appeared to be cheese, in T.'s stomach. T.'s liver was lacerated to the point of near detachment. Even without the head trauma, the laceration of T.'s liver could cause death. The injury to the liver was caused by either a single substantial blow, or a relatively high number of blows. The examination of T.'s head revealed hemorrhage underneath the scalp as well as subdural hematoma. Over time, the head injury could have caused death by itself. There was also evidence of an older brain injury. The cause of death was due to a combination of both the head and abdominal injuries: blunt force injuries to the abdominal area and head.

Detective Griego interviewed Evelyn at the hospital following T.'s death. Prior to the interview with Detective Griego, Duree had told Evelyn that she (Evelyn) should say that she (Evelyn) did it, if asked by anyone, and that if Duree found out Evelyn had said anything about her (Duree), Duree would do to Evelyn what she had done to her brother. Evelyn told the detective that she had stomped her brother because he would not get up for school in the morning. She described kicking T. in the head and hitting him in the

6

head with her shoe, causing his head to bleed. She also told the detective that T. had "stinked up" his breeches so she put his soiled clothing in a plastic bag to wash.

Detective Griego interviewed Evelyn twice between December 7, 1995 and December 8, 1995. During these interviews, Evelyn stated she was the person who struck and kicked T. During the December 8, 1995 interview, Griego observed Evelyn was wearing flats, the same shoes she had worn the previous day.

Detective Griego also talked to O., observing a healed scar on O.'s chest, forehead, and feet. A year earlier, in November 1994, Detective Griego had been aware of activity in the home of O.'s parents and had photographed O.'s hands and feet at that time. The injuries to O.'s hands and feet were not present in November 1994.[5]

On December 8, 1995, Detective Griego visited the home where defendants lived with the G. children. In the garage, he found a bag containing child's clothing that had been soiled with feces.

After T.'s death, the surviving G. children were removed from the defendants' home and placed in separate foster homes. Six months after she had been placed in a new foster home, Evelyn told her foster mother the truth about T.'s death. Richard McEwan,

---

[5] The prosecutor asked numerous questions about photographs of scars on O.'s feet, but did not elicit from the detective a verbal description of the injuries, or the detective's opinion as to whether the injuries were consistent with injuries that might be inflicted by a child wearing flats, as opposed to a person wearing high heels. J. identified the scars on O.'s and T.'s hands and feet from the photographs and testified the marks were the result of Duree bashing them with the heel of her shoe, but did not state whether the shoes were high heels or not. We can speculate that the photographic evidence was intended to show that Duree, not Evelyn, used her heel on the two boys, but the point was not made, and we do not speculate.

7

a marriage, family and child therapist, began counseling the children to ascertain what stage of grieving they were in, and, as to Evelyn, to ascertain the degree of harm suffered as a result of having killed her little brother. With Evelyn, the therapist noticed a pronounced sadness, but he did not find evidence of anger towards T. for misbehaving, or feelings of guilt for hurting him, as expected.

While working with O. individually, the therapist noticed the child was really angry at his aunt, and made comments about hurting her, but O. harbored no anger towards Evelyn. During an individual session with J., McEwan was informed that Evelyn did not hurt T., that her aunt had stomped him; Evelyn had merely covered T. with a blanket and held his hand as he lay on the floor. Prior to this session, there had been no discussions between the two girls about what had happened on the day of T.'s death. Approximately six months after T.'s death, J. also told her father, who had been trying to reunify with his children, that Duree, not Evelyn, had caused T.'s death.

After that, McEwan talked to Evelyn. Evelyn had told the true story to her foster mother, and her foster mother believed that Evelyn did not hurt her brother. Based on what he learned, McEwan wrote a letter to Detective Griego, as well as to CPS, and spoke to Detective Griego by telephone, to report his findings. In subsequent interviews with Evelyn, she told McEwan that Duree had kicked T. on the day of his death. Detective Griego re-interviewed Evelyn in April 1996, from which point, and going forward, Evelyn stated that Duree had beaten T.

On April 30, 2012, an amended information was filed charging one count each of murder (§ 187, subd. (a)) against Duree and Lafayette. They were tried by a jury which

8

found Duree guilty of second degree murder (§ 187, subd. (a)), and found Lafayette guilty of involuntary manslaughter. (§192, subd. (b).) After his verdict was read, Lafayette made a motion to be discharged from the conviction because the statute of limitations had expired on the crime of manslaughter. That motion was denied without prejudice to give counsel time to conduct research.

At the subsequent sentencing hearing, Lafayette's counsel cited the statute of limitations as the legal cause why judgment should not be pronounced, without further argument. The court indicated it had already dealt with that argument and proceeded with sentencing. Duree was sentenced to an indeterminate term of 15 years to life, while Lafayette was sentenced to the upper term of 4 years for the involuntary manslaughter. Both defendants appealed.

**DISCUSSION**

1. *Defendants Forfeited Any Claim of Prejudice Arising from Pre-Charging Delay.*

Duree, joined by Lafayette, argues that the delay in filing charges violated due process and requires reversal of the conviction. Tacitly acknowledging that no motion to dismiss was made in the trial court, Duree argues that the challenge may be raised for the first time on appeal because it involves an important issue of constitutional law or a fundamental right. We have discretion to consider the issue, but the record does not establish prejudice resulting from delay.

The due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, and article I, section 15, of the California Constitution, protect a

9

defendant against the prejudicial effects of lengthy and unjustified delay between the commission of a crime and the defendant's arrest and charging. (*People v. Cowan* (2010) 50 Cal.4th 401, 430, and cases cited.) However, pre-charging delay does not implicate speedy trial rights, although a defendant is not without recourse if the delay is unjustified and prejudicial. (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250 (*Nelson*).) The federal right to a speedy trial attaches only after an arrest or the filing of an indictment or information, although California extends the right by holding that it attaches after a complaint has been filed. (*United States v. Marion* (1971) 404 U.S. 307, 320 [30 L.Ed. 2d 468, 92 S.Ct. 455]; *People v. Mirenda* (2009) 174 Cal.App.4th 1313, 1327.)

A defendant may seek to dismiss a charge on the ground of precharging delay, although he or she must demonstrate prejudice arising from the delay. (*Nelson, supra,* 43 Cal.4th at p. 1250.) Prejudice to a defendant from precharging delay is not presumed. (*People v. Jones* (2013) 57 Cal.4th 899, 921 (*Jones*), citing *Nelson, supra,* 43 Cal.4th at p. 1250; see also, *People v. Abel* (2012) 53 Cal.4th 891, 908-909 (*Abel*).) Prejudice to the defense caused by the passage of time (prior to the filing of charges) is primarily protected by due process considerations and statutes of limitations. (*United States v. MacDonald* (1982) 456 U.S. 1, 8 [102 S.Ct. 1497, 1502, 71 L.Ed.2d 704]; *People v. Butler* (1995) 36 Cal.App.4th 455, 463.) The burden is on the defendant to show prejudice. (*People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 911.)

All of the authorities cited by defendant[6] involve situations in which the defendant made a motion to dismiss in the trial court, asserting prejudice from precharging delay. The defendants here did not.  A constitutional right, like any other right, may be forfeited by the failure to make a timely assertion of the right before a tribunal having jurisdiction to determine it.  (*People v. Harrison* (2013) 57 Cal.4th 1211, 1229; *In re Sheena K.* (2007) 40 Cal.4th 875, 880-881.)  The right to a speedy trial, whether constitutional or statutory, may be waived.  (*People v. Wilson* (1963) 60 Cal.2d 139, 146 (*Wilson*).)  The right must be asserted prior to the commencement of trial.  (*Ibid.*)

Application of the forfeiture rule is not automatic.  (*People v. McCullough* (2013) 56 Cal.4th 589, 593 [failure to contest a jail booking fee]; *In re S.B.* (2004) 32 Cal.4th 1287, 1293.)  Appellate courts have engaged in discretionary review when a forfeited claim involves an important issue of constitutional law or a substantial right.  (*In re Sheena K., supra,* 40 Cal.4th at p. 887, fn.7.)  A reviewing court may address the merits of constitutional challenges that present a pure question of law based on undisputed facts, and involves important questions of public policy.  (*Id.* at p. 888; *Hale v. Morgan* (1978) 22 Cal.3d 388, 394; *People v. Brown* (1996) 42 Cal.App.4th 461, 471.)

However, a claim of prejudice due to precharging delay does not involve a pure question of law because a defendant is required to first demonstrate resulting prejudice, such as by showing the loss of a material witness or other missing evidence, or fading

---

[6] We note that in the case of *Abel*, there is no mention of a motion to dismiss being made in the trial court, but defendant does not rely on that authority, and the issue of forfeiture was not discussed there.

memory caused by the lapse of time. (*Jones, supra,* 57 Cal.4th at p. 921.) Only then must the prosecution offer justification for the delay, and the trial court then considers the motion by balancing the harm to the defendant against the justification for the delay. (*Nelson, supra,* 43 Cal.4th at p. 1250, citing *People v. Catlin* (2001) 26 Cal.4th 81, 107.)

Proof of actual prejudice makes a due process claim concrete and ripe for adjudication, although it does not make the claim automatically valid. (*United States v. Lovasco* (1977) 431 U.S. 783, 789 [97 S.Ct. 2044, 52 L.Ed.2d 752].) The trial court is only required to engage in the balancing process if the defendant has shown actual prejudice. (*People v. Mirenda* (2009) 174 Cal.App.4th 1313, 1327.) Because the defendants did not offer evidence of or show prejudice, the prosecution was not required to show justification for the delay, and the trial court had no obligation to balance the harm from the delay against the justification. (*Jones, supra,* 57 Cal.4th at p. 921; *Abel, supra,* 53 Cal.4th at pp. 910-911.) If the defendant fails to show actual prejudice, the court need not inquire into the justification for the delay since there is nothing to weigh. (*Mirenda, supra,* at p. 1328.)

The analysis of prejudice requires a trial court to consider factual matters which may be disputed, such as the materiality of the witness, the unintentional or willful nature of the delay, whether the faded memories helped or hurt the defense, and the existence of justification, which are fact dependent. Defendants only claim of prejudice is based on the death of a witness, but there were no findings by the trial court as to the materiality of that witness, which is essential to defendants' showing of prejudice.

To allow such a fact-dependent claim to be raised for the first time on appeal would be both unfair and inefficient, where the claim, if timely brought to the attention of the trial court, could have been easily corrected or avoided. (See *People v. Vera* (1997) 15 Cal.4th 269, 275-276, citing *In re Saunders* (1993) 5 Cal.4th 580, 589-590; *In re S.C.* (2006) 138 Cal.App.4th 396, 406.) This is a matter of fairness to the trial court and to the prosecution, because the failure to raise the issue in the trial court deprived the People of an opportunity to present evidence of justification. It is unfair to the trial court, because it was not afforded an opportunity to make findings or resolve the question prior to trial.

Additionally, where the delay is due to the prosecutor's lack of probable cause or proof of a suspect's guilt, there is no strong policy reason that requires appellate review in the first instance. The statute of limitations, which provides predictable, legislatively enacted limits on prosecutorial delay, provides the primary guarantee against bringing overly stale criminal charges. (*United States v. Lovasco, supra,* 431 U.S. at p. 789.) Prosecutors do not deviate from "fundamental conceptions of justice" when they defer seeking indictments (or file other accusatory pleadings) until they have probable cause to believe an accused is guilty. (*Id*. at pp. 790-791.) A court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case. (*Abel, supra,* 53 Cal.4th at p. 911.)

Although courts must consider whether the prosecution had probable cause to believe an accused is guilty in evaluating whether precharging delay is justified, prosecutors are under no duty to file charges as soon as probable cause exists, if they are not satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt.

(*United States v. Lovasco, supra,* 431 U.S. at p. 791.)  Such a policy would increase the likelihood of unwarranted charges being filed and would add to the time during which defendants stand accused but untried.  (*Ibid.*)

Instead, a prosecutor abides by elementary standards of "fair play and decency" if he or she refuses to seek indictments until he or she is completely satisfied that he or she should prosecute and will be able promptly to establish guilt beyond a reasonable doubt.  (*United States v. Lovasco, supra,* 431 U.S. at p. 795.)  Therefore, to prosecute a defendant following investigative delay does not necessarily deprive him or her of due process, even if his defense might have been somewhat prejudiced by the lapse of time.  (*Id.* at p. 796.)

The failure to make a motion to dismiss in the trial court means no findings were preserved for review.  In the related context of speedy trial rights, a defendant's failure to timely object to the delay and thereafter move for dismissal of the charges is normally deemed a waiver of the right.  (*People v. Harrison* (2005) 35 Cal.4th 208, 225; *People v. Wright* (1990) 52 Cal.3d 367, 389 [disapproved on a different point in *People v. Williams* (2010) 49 Cal.4th 405, 459].)  Although we have found no cases precisely on point, the same need for objection applies to precharging delay.  Just as the right to a speedy trial must be asserted in the trial court where the matter is pending, prior to the commencement of the trial (*Wilson, supra,* 60 Cal.2d at p. 146), a defendant asserting prejudice due to precharging delay must make a timely motion to dismiss the charges in the trial court.  In that way, the court can make factual findings on the question of

14

prejudice, and the prosecution will be required to present its justification for the delay, providing the reviewing court an adequate record.

We acknowledge that 16 years is a substantial delay, but it appears that Duree and Lafayette contributed to the delay by threatening to harm the children if the children implicated either of them.[7]  The only actual prejudice defendants can attribute to the delay is the unavailability of the social worker who was assigned to the G.' children at the time of their placement with the Pettresses.  Defendants have not established that the testimony of the original social worker was "material" to their defense, a necessary element of a due process claim arising from precharge delay.  Duree argues that the social worker could have testified that he had visited the Pettress home in his official capacity multiple times during the children's placement there and that there were no signs of abuse of neglect.  However, witness Patrick Aronson, another CPS worker, testified that he was familiar with CPS file for the G. children, and that nothing in the file indicated any signs of abuse or neglect in the home during the period of the placement.  The inability to call the original social worker did not affect defendants' ability to prepare or present a defense.

On this record, while the prosecutor may have had probable cause to initiate a prosecution against Duree and Lafayette six months after the homicide when the detective was contacted by the therapist about Evelyn's recantation, it cannot be said this was sufficient to satisfy the prosecution that it would be able to establish the Pettresses'

---

[7]  Additionally, it appears that Duree and Lafayette lived out of state for part of the time.

15

guilt beyond a reasonable doubt given Evelyn's inconsistent statements. That situation remained static until J. re-contacted the Detective Griego in 2011. The failure to make a motion to dismiss in the trial court leaves us no record defendants' showing of prejudice in the trial court, no findings or ruling to review, and no evidence to evaluate, in order to determine if the delay was prejudicial or not, or if the delay was justified or not.

Acknowledging the lack of objection or motion to dismiss in the trial court, Duree (joined by Lafayette) argues the claim is reviewable under the ineffective assistance of counsel doctrine. To demonstrate ineffective assistance of counsel, defendants must demonstrate that their attorneys' failures to object fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 694.) We cannot find that the attorneys' failure to make a motion to dismiss fell below an objective standard of reasonableness where (a) there is no statute of limitations for murder; (b) the defendants' own conduct in coercing Evelyn to take the blame for the crime, and threatening the children with harm if they implicated either defendant, led to the cessation of the investigation; and (c) the only purported prejudice related to the death of a witness who was not shown to be material.

Because the issue is not a pure question of law, the failure to present evidence of actual prejudice in the trial court by way of a timely motion to dismiss, precludes our review of defendants' due process challenge for the first time on appeal.

2. *The Admission of Lafayette's Alleged Statements Did Not Violate Aranda-Bruton Principles or Duree's Due Process Rights.*

When Lafayette drove the children to school after the fatal beating of T., he told Evelyn that she "better not bring anything on his wife," "better not blame anything on his wife," and that Evelyn should say that she (Evelyn) "did it." He also told all the children that, "If you tell anybody what Duree or I did, we will come back and kill all of you." On appeal, Duree argues that the admission of this evidence violated *Aranda-Bruton* rules, and thus violated her due process rights. We disagree.

The admission into evidence of an admission or confession by one defendant in a joint trial, which implicates both defendants, may result in a denial of due process to the other defendant, even where a limiting instruction is given. (*Aranda, supra,* 63 Cal.2d at pp. 528-529.) In such situations, the trial court can permit a joint trial if all parts of the extrajudicial statement implicating any codefendants can be redacted, or it can grant a severance of trials, or it must exclude the statement if effective deletions are not possible. (*Id.* at pp. 530-531.)

Three years after the decision in *Aranda,* the United States Supreme Court held that the admission of a nontestifying codefendant's confession during a joint trial violated the defendant's Sixth Amendment right to cross-examine witnesses against him. (*Bruton, supra,* 391 U.S. at pp. 136-137.) In both cases, limiting instructions were deemed inadequate, and the cases were presented for review on the question of whether the trial courts erred in denying pretrial motions for severance of the trials of the defendants.

Subsequent decisions held that the admission of a redacted confession or admission—eliminating not only the defendant's name, but any reference to his or her existence—by a non-testifying codefendant fall outside *Bruton's* scope and are admissible, with appropriate limiting instructions, in a joint trial. (*Richardson v. Marsh* (1987) 481 U.S. 200, 211.) Other decisions have addressed the nature of redactions which do or do not resolve *Aranda-Bruton* problems. (See, *Gray v. Maryland* (1997) 523 U.S. 185, 193 [deletions indicated by a blank, or the word "delete," held to be tantamount to an unredacted statement].)

The problem with the procedural posture of the present case is that neither defendant ever made a motion to sever trials or to redact the statements under *Aranda-Bruton*. Instead, during Evelyn's testimony regarding what Lafayette told her during the drive to school on the day of T.'s death, both Duree's and Lafayette's counsel objected on the ground of hearsay. The prosecutor made an offer of proof that the statement was admissible as a statement by a party opponent (admission), but the trial court determined that it was hearsay, and gave both defense counsel an opportunity to "flesh out" their objections. At that point, Duree's counsel stated, "[ . . . ] I believe this is going to be an *Aranda Bruton* issue as to my client." Subsequently, when Evelyn was asked if Lafayette said anything else to her in the car, Duree's counsel objected on "*Aranda-Bruton* grounds," but the court overruled the objection.

We agree with the statement that *Aranda* and *Bruton* stand for the proposition that a nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that

18

defendant's right of confrontation and cross-examination, even if a limiting instruction is given. (*People v. Jennings* (2010) 50 Cal.4th 616, 652; *People v. Ardoin* (2011) 196 Cal.App.4th 102, 135.) But the evidence was relevant and admissible as to Lafayette and Duree did not seek to redact the statement. As pointed out in *Aranda, supra*, 63 Cal.2d at pages 530-531, exclusion of the statement is available where effective deletions are not possible, but Duree did not request any redaction or deletions, so we cannot tell if redaction was possible.[8]

Under these circumstances, the instruction limiting the jury's consideration of the statement to Lafayette must be viewed as an appropriate means of addressing the evidentiary issue. It would be "wholly inappropriate to reverse a superior court's judgment for error it did not commit and that was never called to its attention." (*People v. Lilienthal* (1978) 22 Cal.3d 891, 896; see also, *People v. Gbadebo-Soda* (1995) 38 Cal.App.4th 160, 171 [failure to make a motion for change of venue in superior court results in forfeiture]; *In re Jose C.* (2010) 188 Cal.App.4th 147, 161, citing *In re Cheryl*

---

[8] Respondent argues that the statements were admissible because *Aranda-Bruton* does not apply to nontestimonial statements such as those made by Lafayette, referring to *Crawford v. Washington* (2004) 541 U.S. 36, and its progeny. Some recent decisions have suggested that in the wake of the *Crawford* rule, *Aranda-Bruton* applies only to testimonial hearsay. (See *People v. Arceo* (2011) 195 Cal.App.4th 556, 575.) However, other cases have applied *Aranda-Bruton* to non-testimonial hearsay. (See *People v. Garcia* (2008) 168 Cal.App.4th 261, 283, fn. 12, citing *United States v. Mussare* (3d Cir. 2005) 405 F.3d 161, 168.) Because the trial court instructed the jury not to consider Lafayette's statements as to Duree, and because *Crawford* was not raised in the trial court as a justification for admitting Lafayette's statements against both defendants, we do not need to weigh in on this debate.

*E.* (1984) 161 Cal.App.3d 587, 603 [a party cannot complain because the trial court failed to do something which it was not asked to do].)

Even if the admission of Lafayette's statements could be considered a violation of *Aranda-Bruton*, any error was harmless beyond a reasonable doubt. The jury heard the testimony of Evelyn, J., and O., regarding the events leading to T.'s death. The jury also heard the testimony of the children's therapist, who alerted Detective Griego in 1996 to Evelyn's recantation of responsibility for T.'s death. Further, the jury heard Evelyn's testimony that Duree threatened her in the hospital, coercing Evelyn into claiming she caused T.'s death. Duree's counsel did not object to this evidence.

Even without Lafayette's statement, the jury still had Duree's own statement to consider. Under these circumstances, any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

3. *Admission of Evidence of Prior Child Abuse Was Proper.*

Duree, joined by Lafayette, argues that the prosecution obtained an unfair advantage at trial by way of the admission of "a plethora" of evidence showing that Duree and Lafayette previously engaged in various acts of abuse, mistreatment, and neglect of the children. We disagree.

a. *Procedural Posture*

No in limine motions were made by any party addressing the admissibility of other uncharged acts of abuse. During trial, Evelyn testified about the type of punishment administered to O. and T. by Duree and Lafayette, without objection. Specifically, Evelyn described how the two boys would be required to stand on one foot, with hands

up in the air, and their heads back in the corner. If the boys let their foot down, they would be beaten.

The prosecutor asked Evelyn if she had any prior experience with Duree as it related to punishment. Lafayette's counsel objected on the ground the evidence was irrelevant as to his client, while Duree's counsel objected on the ground the evidence was irrelevant because the information did not pertain to a charged offense. The court overruled the objection and Evelyn explained she was not beaten, but that Duree had attempted to kill Evelyn. Evelyn then described some incidents in which Duree tried to suffocate Evelyn with a pillow, and hit Evelyn on the head with a liquor bottle. There was no further discussion during Evelyn's testimony.

When O. testified, the prosecutor asked him about scars on his hands, as depicted in photographs, and asked him how he received the wounds. Lafayette's counsel objected on the ground the evidence was irrelevant, and Duree's counsel joined in the objection. Without seeking an offer of proof from the prosecutor, the court overruled the objections but invited counsel to make a record outside the presence of the jury. No bench or chambers conference occurred at that time, however, O. proceeded to show his hands to the jury. O. described receiving one wound when Duree threw a knife at him, piercing his hand. O. also described being punished the night before T.'s death by standing in the corner with one foot raised and their hands held above their heads, without objection.

During a recess, the court put on the record that it had allowed a lot of testimony about past prior bad acts, and explained the rationale for admitting that evidence. The

21

rationale was that there were several witnesses who had remained silent for a number of years, that there was torture, and that there was fear of the defendants. The court admitted the evidence to explain the conduct of the witnesses, because of the age of the case, and the age of the witnesses at the time of the events.

Lafayette's counsel indicated he would "Probably offer an 1101." However, when the court indicated it would "strike it all from the record," Lafayette's counsel indicated he was not requesting that; instead, counsel indicated that the defendants would be entitled to "some explanatory limiting instruction, when we get there, as to the prior bad acts."

Duree's counsel then put on the record that he understood the court's analysis, but that the defense position was that as a result of that evidence, the jury would be more likely to think the defendants committed the charged offense, and "we feel it comes down on the side of 352 argument." [*sic*] The court acknowledged the issue, but felt the evidence was more probative than prejudicial.

### b. *Standard of Review*

The trial court's evidentiary rulings are reviewed for abuse of discretion. (*People v. Geier* (2007) 41 Cal.4th 555, 586, citing *People v. Jablonski* (2006) 37 Cal.4th 774, 821; *People v. Rowland* (1992) 4 Cal.4th 238, 264.) The same standard applies to review of a trial court's ruling on whether evidence is relevant, and not unduly prejudicial, for purposes of admissibility. (*People v. McKinnon* (2011) 52 Cal.4th 610, 655.) Where a discretionary power is statutorily vested in the trial court, its exercise of that discretion must not be disturbed on appeal except on a showing that the court exercised its

discretion in an arbitrary, capricious or patently absurd matter that resulted in a manifest miscarriage of justice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125, citing *People v. Jordan* (1986) 42 Cal.3d 308, 316; see also, *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1145 [determination of whether probative value of evidence is outweighed by prejudice].)

    *c.     Analysis*

Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. (*People v. Burgener* (2003) 29 Cal.4th 833, 869-870 (*Burgener*); *People v. Feagin* (1995) 34 Cal.App.4th 1427, 1433.) An explanation of the basis for the witness's fear is likewise relevant to his or her credibility and is well within the discretion of the trial court. (*Burgener,* at p. 869.)

In *Burgener,* the Supreme Court explained that the threats of retaliation explain why the witness's testimony in 1981 differed in certain respect from her current testimony. (*Burgener, supra,* 29 Cal.4th at p. 869.) Evidence of threats or fear is relevant to explain a witness's initial reluctance to discuss a crime with investigating officers. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 289.)

Evidence of prior acts of physical abuse which created a "climate of fear" in the household was relevant to explain why Evelyn initially confessed to killing her brother and later recanted. It also explains why all the children remained silent for so long. Apparently, Evelyn was the only child interviewed in 1995; the other children were not interviewed near the time of the incident. The testimony by Evelyn, J. and O. regarding the harsh punishment practiced in the defendants' household corroborates Evelyn's

23

testimony about those abusive practices, as well as her explanation for why she accepted responsibility for committing the acts that caused T.'s death.

The court weighed the probative value of the evidence against the potential for prejudice, and, after balancing, determined it was more probative than prejudicial. The trial court properly exercised its discretion in admitting the evidence. We find no abuse of discretion or any violation of the defendants' due process rights.

### 4. *There Was No Cumulative Error.*

Duree argues that even if the evidentiary errors are not sufficiently prejudicial to warrant reversal, their cumulative prejudicial effect compels that result.

A series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009; *People v. Hill* (1998) 17 Cal.4th 800, 844.) However, we have found no errors. Reversal is not compelled.

### 5. *Lafayette Waived the Statute of Limitations Bar to His Conviction for the Lesser Offense of Involuntary Manslaughter.*

Lafayette argues that his conviction for involuntary manslaughter, as a lesser included offense, must be reversed because it was barred by the statute of limitations. The offense was committed in 1995, and the charges were brought in 2011, more than 15 years later. Lafayette did not raise the statute of limitations until after the verdict was read. The question to be resolved here is whether Lafayette requested or acquiesced to the instruction on the lesser included offense so as to have waived the statute of limitations defense. We conclude he did.

24

As Lafayette points out, historically, the statute of limitations was viewed as a matter of subject matter jurisdiction, and a defendant's conviction of a time-barred offense was void, even if he failed to assert the statute of limitations as a defense in trial court. (*People v. Morris* (1988) 46 Cal.3d 1, 13, fn.4 [disapproved on a different point in *In re Sassouman* (1995) 9 Cal.4th 535, 545, fn.5]; *People v. Brice* (1988) 206 Cal.App.3d 111, 114 (*Brice*).)

In *Brice,* two defendants were charged with murder in a prosecution that was brought to trial more than three years later. The defendants requested instructions on accessory liability (Pen. Code, § 32) as a lesser related offense, and they were convicted of the lesser related crime. Because neither defendant waived the statute of limitations which barred their convictions for the lesser crime the reviewing court found the lesser crime time-barred. (*Brice, supra,* 206 Cal.App.3d at pp. 115-116.) However, *Brice* was subsequently disapproved by the holding of *Cowan v. Superior Court* (1996) 14 Cal.4th 367, 375. In *Cowan,* the Supreme Court held that the statute of limitations was not a matter of fundamental subject matter jurisdiction. (*Id*. p. 374.)

In the wake of *Cowan,* courts have held that a defendant forfeits the right to complain on appeal of a conviction of a time-barred lesser included offense, where the charged offense was not time-barred and the defendant either requested or acquiesced in the giving of instructions on the lesser offense. (*People v. Stanfill* (1999) 76 Cal.App.4th 1137, 1150; *People v. Beasley* (2003) 105 Cal.App.4th 1078, 1089-1090.) The forfeiture rule of *Stanfill* does not apply where the record does not indicate whether the defendant requested or acquiesced in the giving of instructions on the lesser charge. (*Beasley,* at p.

25

1090.)  Further, a defendant may not inadvertently forfeit the statute of limitations and be convicted of a time-barred offense.  (*People v. Williams* (1999) 21 Cal.4th 335, 337-338.)

In the present case, the record is not silent.  Although the record does not include the form request for instructions normally submitted to indicate the instructions requested by the respective parties, it does include the oral proceedings.  During the discussion pertaining to instructions, Lafayette's counsel indicated that he had submitted some special instruction instructions, although the prosecutor had covered most of them.  After a pause, the court stated, "On we go to the defense instructions."  At that point, Lafayette's counsel asked Duree's counsel, "Did they put your involuntary in here?"  Duree's counsel responded, "Did you include the invol?"  Lafayette's counsel replied, "Yeah, the invol's here, too."[9]

Unlike the situation in *Beasley*, the record in this case is not silent as to whether the defendant requested or acquiesced in the giving of instructions on involuntary manslaughter: both defendants intended to have the jury instructed on the lesser offense, so at a minimum Lafayette acquiesced in the giving of the instruction.  Because the charged offense was not time-barred, and because defendant requested or acquiesced in the giving of instructions on the time-barred lesser offense, he had forfeited the statute of limitations claim.

## DISPOSITION

---

[9] During his summation, Duree's counsel argued that the jury should consider CALCRIM No. 580, the instruction on involuntary manslaughter as a lesser included offense within the charge of murder, although Lafayette's counsel did not mention it.

The judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ_____

P. J.

We concur:

RICHLI_____

J.

MILLER_____

J.