[No. B062809. Second Dist., Div. Two. May 17, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
DEVIN FEAGIN et al., Defendants and Appellants.

## Counsel

Thomas F. Coleman and Mark Alan Hart, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Linda C. Johnson and Sharon Wooden Richard, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

BRANDLIN, J.*—Appellants Devin Feagin and Terrill Ross appeal from the judgment entered following their convictions by jury trial of murder (Pen. Code, § 187). As to Feagin, the jury found true the special circumstance allegations of first degree residential robbery and burglary, within the meaning of Penal Code section 190.2, subdivision (a)(17). In addition, both appellants suffered convictions for robbery (Pen. Code, § 211), residential burglary (Pen. Code, § 459), and assault with a firearm (Pen. Code, § 245, subd. (a)(2)). The jury found true allegations that appellants had personally used a firearm during the commission of the above offenses, within the meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1).

The jury deadlocked in the penalty phase as to Feagin, and the trial court declared a mistrial. The trial court sentenced Feagin to life in prison without possibility of parole, plus a consecutive four-year term for assault with a

---

*Judge of the Municipal Court for the South Bay Judicial District sitting under assignment by the Chairperson of the Judicial Council.

firearm (Pen. Code, § 245, subd. (a)(2)). Ross was sentenced to 25 years to life, plus a consecutive 2-year term for the personal use of a firearm pursuant to Penal Code section 12022.5.

Feagin contends: "I. The court abused its discretion in admitting evidence of a prior crime committed by Feagin. II. The court abused its discretion in removing Juror Kathy Perdue from the jury panel during its deliberations."

Ross contends: "I. The trial court erred to appellant's prejudice by denying appellant's request to be tried by a separate jury, thus forcing appellant to be tried before a death qualified jury. II. The trial court abused its discretion when it removed Juror Kathy Perdue during deliberations. III. Appellant was denied his right to a public trial and to be present because the hearing regarding removal of Juror Kathy Perdue was conducted in chambers. IV. Pursuant to rule 13, California Rules of Court, appellant joins in coappellant Feagin's opening brief."

## STATEMENT OF FACTS

On April 29, 1988, Faye King was in the kitchen of her home, and her husband Howard was in the bedroom, when two men crashed through the bedroom door and yelled, "this is a robbery and we have cocked guns." Faye King attempted to call 911 but was ordered at gunpoint by the shorter of the two men, identified at trial as Ross, to hang up the phone and get on the floor. She complied. The taller man, identified at trial as Feagin, went into the bedroom and shot Howard in the chest with a .380-caliber handgun, killing him. Ross asked Feagin, "do you have any money?" Feagin replied, "lots." The men fled from the location, taking from the home a .22-caliber pistol, the Kings' passports, and a Seiko watch.

In addition to eyewitness identification, Feagin's fingerprints were found on the back door of the victims' residence. Ross's fingerprint was found on a newspaper inside the home, and shoe prints were discovered in the backyard of the King residence which could have been made by appellants' shoes.

Several of the Kings' neighbors had observed a gold Cadillac belonging to Feagin and his aunt, Deana Thompson, driving slowly through the neighborhood the day before. They obtained the vehicle license plate number and gave it to police after the murder.

Deitric Gardner had known both appellants most of his life. On April 29, 1988, Deitric overheard Feagin and Ross speaking with a friend, Russell

White. Feagin said, "I just shot this nigga." Feagin stated that Ross had kicked the door down and told the lady to get on the floor. The lady tried to call 911. Feagin also said he got a watch and a .22-caliber gun, but no money. Deitric had previously observed appellant Feagin with a .380-caliber gun.

In August 1987, Feagin had tried to kill Deitric by pointing a nine-millimeter pistol in his face and pulling the trigger five times. The gun, however, did not fire. Deitric heard him say, "man, I had him. I had him point blank dead. The gun just didn't go off."

Pending trial, Deitric's brother, Henry Gardner, was in custody. Feagin confronted him and said, "Your brother going to court on me." Several days later, Feagin and others assaulted Henry Gardner.

### DEFENSE

Appellants testified in their own defense. They denied being involved in the robbery and murder of Howard King. They claimed that they were in Woodland Hills on April 28, 1988, to visit a friend and then became lost.

In an apparent attempt to explain Ross's fingerprints on the back door of the victims' residence and the appellants' possible shoe prints in the backyard, appellants claimed to have been chased by a car containing two or three young Black males. They drove down a dead-end street, abandoned the car, ran through several backyards, knocked on some doors, and yelled for help. After discovering that they were no longer being pursued, they returned to the Cadillac and drove back to Los Angeles. They gave an alibi defense for the evening of April 29, 1988.

Ross testified that after his arrest, he touched a newspaper in an interview room. Feagin denied trying to kill Deitric Gardner. He did admit that he pointed a gun at Deitric to embarrass and scare him. He claimed the gun was unloaded and inoperable. He denied being involved in the attack on Deitric's brother.

### DISCUSSION

We first address the contentions raised by Feagin. Ross joins in these contentions.

### I. *Evidence of Prior Crime*

Feagin's first contention, that the trial court erred in allowing Deitric Gardner to testify that Feagin tried to kill him in 1987, lacks merit. At trial,

Feagin objected to the introduction of this evidence. After the court ruled that the statements Deitric had overheard were admissible against Ross as adoptive admissions, Ross took the position that he should be allowed to cross-examine Deitric about the incident in order to attack Deitric's credibility. Feagin urged that if the trial court were to allow the cross-examination, it should sever the trials, because as to him the evidence was more prejudicial than probative.

■ Evidence that a witness is afraid to testify is relevant to the credibility of the witness. (*People* v. *Warren* (1988) 45 Cal.3d 471, 481 [247 Cal.Rptr. 172, 754 P.2d 218].) An explanation of the witness's fear is relevant to the jury's assessment of the witness's credibility and is well within the discretion of the trial court. (*People* v. *Avalos* (1984) 37 Cal.3d 216, 232 [207 Cal.Rptr. 549, 689 P.2d 121]; *People* v. *Gutierrez* (1994) 23 Cal.App.4th 1576, 1588 [28 Cal.Rptr.2d 897].) ■ Here, the trial court weighed the probative value and prejudicial effect of the testimony pursuant to section 352 of the Evidence Code. It concluded that the episode would be too difficult to excise from the remainder of Deitric Gardner's testimony regarding Feagin's admissions and Ross's adoptive admissions. The trial court's ruling that "its relevancy far outweighs any prejudicial impact to Mr. Feagin" was well within its discretion.

■ Feagin correctly states the general rule that the reasons underlying the witness's fear are no longer relevant to establish or corroborate bias where the witness admits to bias against the party. (*People* v. *Morris* (1988) 46 Cal.3d 1, 39 [249 Cal.Rptr. 119, 756 P.2d 843], disapproved on another point in *In re Sassounian* (1995) 9 Cal.4th 535, 545 [37 Cal.Rptr.2d 446, 887 P.2d 527].) The reason for the rule is obvious: it prohibits the prosecution from doing indirectly what it cannot do directly. Where cross-examination has shown bias or prejudice on the part of the witness, he or she cannot be rehabilitated by showing his bias is justified. (*People* v. *Pierce* (1969) 269 Cal.App.2d 193, 205 [75 Cal.Rptr. 257].) ■ Here, however, the evidence explained not only Deitric's state of mind, but also his demeanor in court and his prior actions.[1] (See *People* v. *Brooks* (1979) 88 Cal.App.3d 180, 187 [151 Cal.Rptr. 606]; *People* v. *Yeats* (1984) 150 Cal.App.3d 983, 986-987 [198 Cal.Rptr. 268]; *People* v. *Warren, supra,* 45 Cal.3d 471, 481.)

---

[1]"THE COURT: Well, I've given this a great deal of thought, and I have reread the transcript where the witness Deitric Gardner testified on Monday May 7, 1990, and I've also reread the transcript of the tape recording that was made of his interview with the D.A.'s office and with the investigating officer, and I think that the alleged prior incident where allegedly Mr. Feagin pointed a gun at Mr. Deitric Gardner and pulled the trigger and allegedly the gun misfired, *I think it is highly relevant to all sides and really cannot be excised out in any meaningful way.*

"There are just too many unanswered questions. If it were tried, if it were to be—if the court were to try to excise it out, for example, *there would be no explanation for why Deitric Gardner would back up and not be part of the group and Mr. Feagin drove up; or alternatively*

The testimony explained the fear Deitric felt when appellant's aunt followed him from the courtroom; his reaction to the assault on his brother in jail by Feagin two days after his earlier testimony; his reluctance to testify and inconsistent statements; his reasons for leaving a group in which he overheard statements when approached by appellants; and his reasons for hiding his face while testifying. The trial court properly balanced the probative value versus the prejudicial effect of the evidence. Moreover, in light of the overwhelming evidence of guilt in this case, any error in this regard must be deemed to be harmless. (*People* v. *Morris, supra,* 46 Cal.3d at p. 39.)

## II. *Removal of Juror Perdue*

Feagin's second contention (asserted by Ross as his second contention), that the trial court erred in dismissing Juror Perdue, also lacks merit. Penal Code section 1089 authorizes a trial court to dismiss a juror before the jury returns its verdict if the juror becomes ill or upon a showing of good cause

*from the defense side, there would be no explanation as to why he backed up and had overheard the group in a distance instead of being part of the group.*

"Also, there would be no explanation from the People's side as to *why he would come forward at this late stage in the proceedings;* and alternatively, from the defense side, there would be no explanation for *why he would fabricate it at this late stage of the proceedings.*

"So I think from both sides, both in terms of the People's efforts to bolster his credibility and the defense efforts to destroy his credibility, it seems to me this is highly relevant.

"The incident involving his brother, Henry Gardner, *it seems to me* [the] *alleged incident would not be relevant at all, unless the prior incident were admissible,* because it is my understanding that Mr. Henry Gardner is going to testify that Mr. Feagin beat him up in the county jail and said allegedly, 'your family's a snitch.'

"And since this occurred before Mr. Deitric Gardner came forward with the—attributing these statements to Mr. Feagin, there wouldn't be any explanation for what 'your family's a snitch' means unless Mr.—the jury knew Mr. Deitric Gardner was going to testify to this alleged act of violence and in a potential penalty phase.

"I suppose with regard to that incident, perhaps the explanation could just be given that Mr. Deitric Gardner was going to be a witness in the penalty phase, but that would leave all sorts of speculation which might even be worse than the actual incident itself.

*"And furthermore, it also seems to me that the defense also would not be able to show bias and prejudice in general without this testimony because, as Mr. Atkinson correctly pointed out, Mr. Deitric Gardner in fact on page 119 denied that he disliked Mr. Feagin or that he had anything against Mr. Feagin or that he had any motive to see him locked up for as long as possible.*

"And I agree with Mr. Atkinson, *I don't agree that it would be either appropriate or feasible for the court to instruct the jury he is bias* [sic].

"First of all, the court always tells the jury that it is up to them to decide what the facts are and it is not up to the court to tell them who to believe and who not to believe, and if the court were to do so, *they would have no way of knowing how much weight to put on an instruction that Mr. Deitric Gardner is bias* [sic] *if they did not know what exactly it entailed or how to weigh and evaluate it.* So it seems to me it is highly relevant from all three sides, both from the People's side, from Mr. Feagin's side and from Mr. Ross' side that it is highly relevant, and in light of that, *I do believe it is so highly relevant that its relevancy far outweighs any prejudicial impact to Mr. Feagin.*" (Italics added.)

that the juror is unable to perform his or her duty. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 864 [277 Cal.Rptr. 122, 802 P.2d 906].) A trial court's exercise of discretion will be upheld if supported by substantial evidence. (*People* v. *Johnson* (1993) 6 Cal.4th 1, 21 [23 Cal.Rptr.2d 593, 859 P.2d 673].) A juror's inability to perform his or her functions, however, must appear as a " 'demonstrable reality,' " and bias may not be presumed. (*People* v. *Thomas* (1990) 218 Cal.App.3d 1477, 1484 [267 Cal.Rptr. 865].)

The court received two notes from the jury after several days of deliberation. One of the notes was from Foreperson Gunn, the other from Juror Perdue. The court notified the attorneys of the notes and suggested that the matters be addressed in chambers in the presence of counsel. There was no objection to the suggested procedure.

The court, in chambers, read Foreperson Gunn's note regarding Juror Perdue to counsel and proposed to call the foreperson in and question her regarding her note.[2] There was no objection to the suggested procedure from the attorneys.

Foreperson Gunn informed the court that Juror Perdue was not deliberating with the other jurors, not explaining her viewpoints, and indicated to the others that her mind was already made up and she was not going to change her mind, even on issues that had not yet been discussed. After questioning Foreperson Gunn, the court read Juror Perdue's note to counsel, then summoned Juror Perdue, and questioned her regarding her note, without objection by counsel.[3]

Juror Perdue stated she was concerned with racial prejudice directly related to the juror's opinions toward the defendants and their attorneys. She related a number of comments made by other jurors during the proceedings which she felt were attributable to racial prejudice.

---

[2]"JUDGE STOLTZ: It has been made clear to me in our deliberations that one juror, Kathy Perdue, does not feel comfortable following the jury instructions. I feel her decision is based on emotions and not on what the evidence tells her. She has admitted to this, and on two occasions has said that her mind was made up before certain issues were even discussed. I think this is a matter for your consideration. Thank you. Jean Gunn."

[3]"Your Honor, I have a major problem with the deliberations. The other jurors are doing everything possible to assume guilt without giving the defendants the benefit of the doubt.

"From the beginning of the trial I have overheard statements regarding the proceedings that have not been favorable toward the attorneys and the defendants.

"Because of this, I feel the deliberation process will not conclude to a verdict. I am concerned with the honesty of all the witnesses, which leaves me with 11 people with whom I cannot sway to consider any other alternatives besides the guilt of the defendants. I am concerned with the preconceived notions on the part of the other jurors.

"I am really concerned with racial prejudice directly related to the jurors' opinions toward the defendants and their attorneys.

"Signed, Kathy Perdue."

After speaking with Juror Perdue, the court suggested that some, if not all of the other jurors be questioned to get their perspectives. Again, there was no objection by the parties. The court then interviewed Juror Caton, who denied hearing any comments by any of the jurors, other than Juror Perdue, that could be interpreted as racial bias. She indicated that Juror Perdue brought up issues related to the "(Rodney) King" incident and Juror Perdue's comment that ". . . the police department are prejudiced against Black people . . . ."

The court then interviewed Juror Ruppert without objection by counsel. Juror Ruppert related that Juror Perdue would not explain why she thinks a certain way, and had brought up the King case saying, "the officers could be biased or they could have framed Mr. Ross." Juror Perdue indicated that the other jurors weren't going to be able to change her mind prior to the jurors' even discussing certain points, including any deliberations as to the codefendant.[4]

After the interview with Juror Ruppert, defense counsel objected for the first time to the continued examination of jurors in chambers, and requested that the proceedings be conducted in open court in the defendants' presence and that the jurors be sworn and examined by counsel. The court denied the requests and made findings on the record in support of the court's reasoning for continuing the matter in chambers.[5]

The court then interviewed the remaining eight jurors. A majority of the jurors confirmed that Juror Perdue was unwilling to participate in the jury

---

[4]"THE COURT: Okay. Did there ever—was there a point, ever come a point in time where any of the jurors indicated that their minds were made up and that they wouldn't discuss the matter any further?

"JUROR RUPPERT: Yeah. One juror did say that we weren't going to change her mind.

"THE COURT: This was Kathy Perdue I take it?

"JUROR RUPPERT: Yes.

"THE COURT: And was this about a point that had already been discussed or points that hadn't been discussed or both?

"JUROR RUPPERT: *Points that we hadn't even discussed. One of the defendants—we were just working on the one defendant, and she just said that her mind was made up and we weren't going to change it.*

"THE COURT: *On the other defendant that had not yet been discussed?*

"JUROR RUPPERT: *Yes.*" (Italics added.)

[5]"THE COURT: . . . Well, it seems to me it would be very unfortunate and unproductive to have the attorneys in an adversary relationship with the jurors cross-examining them about their statements, and I think that that would be unwise and unproductive.

"I don't believe that the court is—first of all, I think this is also—I still feel and I thought from the beginning, I still feel that it's more appropriate to handle this back in chambers, that is not something that would be helpful to see reported in the press as to—we have gotten into very intimate details of the jury deliberations, which normally the court and attorneys are not privy to, and I think this is something which would be inappropriate to have in open court available to the public at this particular point in time where there may be articles criticizing

discussions, refused to explain her thoughts and had brought up issues of police bias against Blacks, specifically referring to the Rodney King incident. It became apparent that at the time Juror Perdue announced that she had "made up her mind and could not be convinced to change her mind," the deliberations concerning one defendant had not been completed, deliberations as to the other defendant had not started and no votes had been taken on either defendant on any count or allegation.

After conducting the interviews in chambers, the court provided counsel with the opportunity to argue the matter in open court with their clients present but outside the presence of the jury. The court then made the findings of juror misconduct and excused Jurors Perdue,[6] Soloman and Lelong.[7] The jury was instructed not to speculate as to the reasons the three jurors were excused. They were then instructed to start deliberations anew.

■ We find substantial evidence in the record to support the finding that Juror Perdue was unable to perform her functions as a juror as a demonstrable reality, in that she had prejudged the credibility of the police officers who had testified at trial and was unable to cast aside her personal bias in weighing the evidence. (*People* v. *Thomas*, *supra*, 218 Cal.App.3d at p. 1485.)

---

the jury deliberation or how certain jurors have acted, and I think that would be very unfortunate if that were to occur at this stage of the proceedings."

[6]"[THE COURT:] I am making a finding of fact at this time that Kathy Perdue is evaluating the evidence based on her emotions and not on a rational analysis of the evidence.

"That she came in with a bias against police officers, and that she would not believe any member of the Los Angeles Police Department if it pertained to a statement or situation having to do with a Black person that is. That she was prejudiced.

"That she is unwilling and unable to participate in meaningful deliberations with the other jurors, and that further instructions to her at this time would not be productive.

"The other jurors have already read the instructions to her several times in an attempt to persuade her to participate in meaningful deliberations.

"Although it helped on a temporary basis, she finally admitted that she was going to follow her emotions, and even if she intellectually believed a fact, if her emotions told her otherwise, she would not vote according to her intellectual analysis of the situation. But would vote according to her heart.

"I think that either one of those grounds either the prejudice or the inability to participate in meaningful jury deliberations either one by themselves would be good cause to remove her as a juror. I am going to remove her as a juror.

". . . . . . . . . . . . . . . . . .

"[THE COURT:] Now, Kathy Perdue denied these allegations. But I do not find her denials credible. I think they were self-serving and made simply to put herself in a better light."

[7]The court excused Juror Soloman for prejudging evidence and Juror Lelong for his inability to follow instructions particularly related to his looking up the term "preponderance of the evidence." There was no objection to excusing either of these jurors.

## III. *Denial of Separate Juries*

■ Ross's first contention, that the trial court erred in denying his request that he be tried by a separate jury, is unavailing. He urges that joinder with Feagin, who was tried before a death-qualified jury, prejudiced him in that the removal of qualified jurors for cause on death penalty issues forced him to submit to a jury which was more prone to conviction. This position has been consistently rejected by our Supreme Court. (See *People* v. *Keenan* (1988) 46 Cal.3d 478, 503 [250 Cal.Rptr. 550, 758 P.2d 1081]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 79-80 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 [197 Cal.Rptr. 803, 673 P.2d 680]; *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 61-69 [168 Cal.Rptr. 128, 616 P.2d 1301]; and *People* v. *Wimberly* (1992) 5 Cal.App.4th 773, 794 [7 Cal.Rptr.2d 152].) We are, of course, bound by our Supreme Court's decisions.

## IV. *In-chambers Hearing Concerning Juror Misconduct*

Ross's third contention, that the trial court denied his right to a public trial and to be present by conducting the hearing regarding juror misconduct in chambers, is equally unavailing. ■ A defendant waives his or her right to object to an in camera hearing between the judge and a juror by consenting to the procedure. (*People* v. *Siripongs* (1988) 45 Cal.3d 548, 573-574 [247 Cal.Rptr. 729, 754 P.2d 1306].) ■ Here, Ross consented to the in-chambers procedure for the first four jurors. At that point, he interposed an objection for the first time, but by then sufficient grounds for excluding Juror Perdue already existed.[8]

■ Even assuming the issue has not been waived, the proceeding involved here is not one which the public or the defendant has a right to attend. It has long been recognized that " '[t]he trial of the action, so far as the term "public trial" is concerned, consists in the proceedings for the impanelment of the jury, the opening statements of counsel, the presentation of evidence, the arguments, the instructions to the jury and the return of the verdict,' but does not include conferences between court and counsel where 'the subject matter of the conferences between court and counsel was a question or questions of law, and not matters advanced for consideration of the triers of fact.' " (*People* v. *Harris* (1992) 10 Cal.App.4th 672, 685 [12 Cal.Rptr.2d 758], citing *People* v. *Teitelbaum* (1958) 163 Cal.App.2d 184,

---

[8]Based upon the information from the first four jurors alone, there was substantial evidence to justify removing Juror Perdue. The remaining eight jurors were then interviewed in camera over the defense objection. In addition to supporting the trial court's decision to remove Juror Perdue, the hearing established good cause to remove Jurors Soloman and Lelong, to which the defense did not then, and does not now, complain.

206-207 [329 P.2d 157]; see also *People* v. *Murphy* (1973) 35 Cal.App.3d 905, 925-926 [111 Cal.Rptr. 295].) The accused is not entitled to be personally present during proceedings which bear no reasonable, substantial relation to his opportunity to defend the charges against him or her. (*People* v. *Siripongs, supra,* 45 Cal.3d at p. 572; *People* v. *Hovey* (1988) 44 Cal.3d 543, 573-574 [244 Cal.Rptr. 121, 749 P.2d 776].) ▮ Ross has made no effort to demonstrate that his absence from the in camera hearing impaired his ability to "defend the charges against him." (*People* v. *Jackson* (1980) 28 Cal.3d 264, 309-310 [168 Cal.Rptr. 603, 618 P.2d 149]; *People* v. *Bloyd* (1987) 43 Cal.3d 333, 359-361 [233 Cal.Rptr. 368, 729 P.2d 802].)

▮ Even assuming the Sixth Amendment public trial guarantee applies to the juror removal proceeding, the "presumption of openness" is rebutted by a showing that exclusion of the public was necessary to protect some higher value such as the defendant's right to a fair trial or the government's interest in preserving the confidentiality of the proceedings.[9] (*People* v. *Woodward, supra,* 4 Cal. 4th 376, 383, citing *Waller* v. *Georgia* (1984) 467 U.S. 39, 44-45 [81 L.Ed.2d 31, 37-38, 104 S.Ct. 2210].) ▮ Here, the sensitive nature of the juror disclosures in this case would justify excluding the public.[10]

▮ Moreover, a partial closure, that is, exclusion of the public from a small part of a trial, does not constitute prejudice per se. (*Press-Enterprise Co.* v. *Superior Court* (1984) 464 U.S. 501, 512 [78 L.Ed.2d 629, 639-640, 104 S.Ct. 819] [exclusion from six weeks of jury voir dire]; *Waller* v. *Georgia, supra,* 467 U.S. 39 [exclusion from entire pretrial suppression hearing]; *United States* v. *Sherlock* (9th Cir. 1989) 962 F.2d 1349, 1357-1358 [temporary exclusion of defendant's family members from courtroom during testimony of rape victim]; *People* v. *Woodward, supra,* 4 Cal.4th 376 [doors locked for ninety minutes while the prosecutor completed his closing argument].) ▮ In the instant case, the in camera proceedings lasted approximately two and a half hours, compared to the evidentiary phase of the trial which lasted over two months. We conclude that, as in *Woodward, supra,* 4 Cal.4th at page 376, the closure, if error at all, was at most a "trial

[9]Like our Supreme Court in *People* v. *Woodward* (1993) 4 Cal.4th 376 [14 Cal.Rptr.2d 434, 841 P.2d 954], ". . . we have no occasion in this case to consider any special obligations trial courts may owe to the press or news media arising under the First Amendment to the United States Constitution." (*Id.,* at p. 381.)

[10]We take judicial notice that jury deliberations in this case began on March 18, 1991, 15 days after the infamous "Rodney King" incident of March 3, 1991, where local and international press coverage lasted for a significant period of time. The press coverage was so heavy in Los Angeles County that this court granted a writ of mandate and ordered the Los Angeles Superior Court to grant the motion for change of venue. (*Powell* v. *Superior Court* (1991) 232 Cal.App.3d 785 [283 Cal.Rptr. 777].)

error," subject to evaluation under the standard enunciated in *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065], and harmless beyond a reasonable doubt.

## DISPOSITION

The judgments are affirmed.

Boren, P. J., and Fukuto, J., concurred.

Appellants' petition for review by the Supreme Court was denied August 10, 1995. Mosk, J., was of the opinion that the petiton should be granted.