Filed 5/23/16  P. v. Scarbrough CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DARYL JASON SCARBROUGH,<br><br>    Defendant and Appellant. | G052187<br><br>(Super. Ct. No. FV11301862)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of San Bernardino County, Alexander R. Martinez, Judge.  Affirmed.

Cindy Brines, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Collette C. Cavalier, and Alastair J. Agcaoili, Deputy Attorneys General, for Plaintiff and Respondent.

In the summer of 2013, Daryl Jason Scarbrough went on a crime spree. A jury convicted Scarbrough of multiple offenses taking place over a two-month period. On appeal, he argues the convictions must be revered because the trial court discharged a juror without good cause. We conclude the contention lacks merit, and we affirm the judgment.

I

On June 22, 2013, San Bernardino County Sheriff's deputies James Williams and Rich Daniel responded to a call reporting several suspects were stripping a vehicle. When Williams arrived to the location, he saw two men and one woman. Scarbrough appeared to be working under the hood on the engine of a white pickup truck. His male companion was sitting in the truck's driver's seat. The female companion was standing nearby. Scarbrough's vehicle, a red pickup truck, was parked in front of the white pickup truck. Williams noticed there was a motorcycle lying in the bed of the red truck. Williams told the suspects he was there to verify the white truck was not being stripped.

Meanwhile, Daniel arrived on the scene. As he was looking at the motorcycle, Scarbrough walked towards him and asked if he had a warrant to look at his truck. Scarbrough appeared to be agitated and upset and asked Daniel why he was being harassed. Because of Scarbrough's demeanor and raised voice, Daniel became concerned for his own and Williams' safety. Daniel told Scarbrough to turn around and put his hands behind his back. Scarbrough did not comply and instead punched Daniel in the chest and ran away.

The deputies chased Scarbrough and initially lost sight of him. While being pursued, Scarbrough entered Rosa Rodriguez's home while she and her children were inside. He ran through the residence and escaped through a bedroom window. He was eventually found hiding in a bedroom closet of a different home. When Williams ordered Scarbrough to show his hands and lie on the floor, he would not comply. A

2

struggle ensued and the deputies were ultimately able to remove Scarbrough from the closet and handcuff him.  As they escorted Scarbrough out of the house, he lunged head first at Daniel, who raised his hands to protect himself.  Scarbrough was injured by this contact and taken to the hospital.

The following week, on June 27, 2013, Scarbrough and a female companion entered a Walmart store in Hesperia.  The loss prevention officers, Brian Lee and Eric Johnson, began watching Scarbrough on their video surveillance system after an employee signaled there may be a problem.  They saw Scarbrough's companion give him a Walmart grocery bag as they walked away from the return counter.  The officers watched Scarbrough walk to the camera department, take a camera in a blue box, and put it in the bag he was holding.  Lee watched Scarbrough and his companion walk past the cash registers and towards the exit without paying for the camera.  Meanwhile, Johnson left to intercept Scarbrough outside the store.

Walmart had an inner and outer set of entrance doors.  Johnson contacted Scarbrough in between the two sets of doors and identified himself as a loss prevention officer.  Lee explained that once Scarbrough walked through the first set of doors, he had exited the store because "it's past the last point of sale."

Johnson asked Scarbrough to go back inside.  Lee saw Scarbrough reach for his waistband but he could not determine what, if anything, Scarbrough retrieved from there.  However, Johnson saw it was a knife and he backed away, yelling, "knife." Not hearing the warning, Lee attempted to grab Scarbrough's left arm, and Scarbrough made a downward slashing motion with his right hand injuring Lee.  Lee released Scarbrough's arm, and he dropped the Walmart bag and a knife.  As Lee retreated to the store, he saw Scarbrough pick up the knife and the bag.  Inside the store, Lee and Johnson looked at the security cameras and saw Scarbrough and his female companion get into a red truck and drive away.

3

At the end of July 2013, Scarbrough was involved in a hit and run. It was nearly midnight when Upland Police Officer George Hajj pulled over Scarbrough for driving in the wrong direction on a freeway off-ramp. When Hajj, dressed in his police uniform, began to step out of his marked police vehicle, Scarbrough sped away. Hajj pursued Scarbrough through a commercial parking lot after activating his emergency lights and sirens.

Scarbrough's vehicle collided with and damaged the side of another vehicle, but he did not stop. The chase continued through the neighboring streets, during which Scarbrough drove at unsafe speeds, ran a red light, and drove on the wrong side of the road. Scarbrough then drove into a cul-de-sac, got out of his car, and ran into the garage of a nearby residence. Police arrested him in the garage.

Scarbrough testified at trial in his own defense. Regarding the first incident on June 22, 2103, Scarbrough said he bought new tires for his truck and as he was driving he saw an elderly man with a broken down truck. Scarbrough stopped to help him and the police soon arrived. Scarbrough stated that when he approached Daniel, asking if he had a warrant, Daniel reacted aggressively. He claimed Daniel rushed towards him and reached for his face, injuring his eyebrow. Scarbrough said he had a previous contact with Daniel and he fled out of fear.

Scarbrough admitted he ran through one house and then entered an abandoned home and hid in the closet. Scarbrough added that he did not resist Williams' efforts to subdue him as he hid in the closet, but rather the deputies kicked him in the head several times. He also denied lunging at Daniel, and said Daniel punched him in the face while he was handcuffed and being led out of the house.

With respect to the Walmart incident, Scarbrough denied taking the camera out of the store. Scarbrough claimed he received a store credit after returning a phone card. He next selected a camera for his girlfriend and put it in his bag. Scarbrough stated he walked through the store to leave and took the camera out of his bag and set it down

4

inside the store. Scarbrough did not know Lee and Johnson were loss prevention officers, and he denied having a knife. He said a big guy with tattoos jumped on his back and other man grabbed him from behind. Scarbrough said he dropped his bag and the men ran away.

As for the last incident in Upland, Scarbrough admitted he fled from Hajj and damaged a vehicle during the high-speed chase. Scarbrough explained he did not have proper car registration and feared the police would take away his car.

A second amended information charged Scarbrough with the following eight counts: First degree burglary (Pen. Code, § 459)[1] (count 1); attempted first degree burglary (§§ 664, 459) (count 2); two counts of resisting an executive officer (§ 69) (counts 3 & 4); second degree robbery (§ 211) (count 5); assault with a deadly weapon (§ 245, subd. (a)(1)) (count 6); evading an officer with willful disregard for the safety of persons and property (Veh. Code, § 2800.2, subd. (a)) (count 7); and hit and run driving (Veh. Code, § 20002, subd. (a)) (count 8). The information further alleged Scarbrough committed the crimes in counts 5, 6, and 7 while released from custody on bail (§ 12022.1), he personally used a deadly weapon in the commission of the crime in count 5 (§ 12022, subd. (b)(1)), and he had one prison prior (§ 667.5, subd. (b)). Thereafter, the prosecution moved to dismiss count 2 and the trial court granted the motion.

The jury acquitted Scarbrough of count 1 and convicted him as charged on counts 6, 7, and 8. It convicted him of the lesser included offenses of count 4 and 5, i.e., resisting a peace officer and petty theft. Scarbrough admitted the prison prior and out-on-bail allegations as to count 6. The court sentenced Scarbrough to 18 months in jail, followed by eight years and four months in prison.

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

5

## II

Scarbrough's sole issue on appeal is that the trial court's decision to discharge Juror No. 11 was not supported by the evidence. The Attorney General argues there was "overwhelming evidence" the "discharged juror failed to follow the law as set forth in the instructions, refused to deliberate with her other panelists, and harbored a disqualifying personal bias." We conclude this record shows a demonstrable reality that Juror No. 11 refused to deliberate or follow the instructions as written due to a disqualifying bias. Accordingly, the court did not abuse its discretion in dismissing Juror No. 11.

"If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate . . . ." (§ 1089.) "While a trial court has broad discretion to remove a juror for cause, it should exercise that discretion with care." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052, fn. omitted (*Barnwell*).) The trial court's decision to dismiss a sitting juror will be upheld on review if the juror's inability to serve appears in the record as a *demonstrable reality*. (*Ibid.*) This standard of review is more stringent and requires a stronger evidentiary showing than the deferential substantial evidence test. (*Ibid*.)

"The demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact did rely on evidence that, in light of the entire record, supports its conclusion [dismissal is appropriate]. It is important to make clear that a reviewing court does *not reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied. [¶] In reaching that conclusion, the reviewing panel will consider not just the evidence itself, but also the record of reasons

6

the court provides. A trial court facilitates review when it expressly sets out its analysis of the evidence, why it reposed greater weight on some part of it and less on another, and the basis of its ultimate conclusion that a juror was failing to follow the oath. In taking the serious step of removing a deliberating juror the court must be mindful of its duty to provide a record that supports its decision by a demonstrable reality." (*Barnwell, supra,* 41 Cal.4th at pp. 1052-1053.)

In this case the trial court discharged Juror No. 11 upon a finding of "good cause" (§ 1089). "Section 1089 provides that a trial court may dismiss a juror and replace him or her with an alternate if it finds the juror is unable to perform his or her duty. The court properly may dismiss a juror based on the juror's 'unwillingness to engage in the deliberative process.' [Citation.] A juror who expresses a fixed conclusion at the start of deliberations and rebuffs attempts to engage him or her in the discussion of other points of view raised by other jurors has refused to deliberate, and properly may be discharged. On the other hand, '[t]he circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge.' [Citation.] A deliberating juror's refusal to follow the law set forth in the instructions also constitutes a failure to perform the juror's duties, and is grounds for discharge. [Citation.]" (*People v. Alexander* (2010) 49 Cal.4th 846, 926.)

With these legal principles in mind, we turn to the circumstances of this case. The jury was impaneled on April 8, 2014, and after a three day trial, the jury commenced deliberations at the end of day on April 14. The next morning, the jury resumed deliberations at 9:00 a.m., and after 23 minutes submitted the following three questions to the court: (1) Can we have a laptop to view the video showing when

7

Scarbrough was met by the loss prevention officers outside Walmart?  (2) Can we review the entire testimony of Hajj? and (3) Can we review the testimony of Williams pertaining to Scarbrough's interaction with Daniel in front of the trucks?  The court re-showed the video in the courtroom and had the testimony transcribed for the jury.

That same day, at 2:50 p.m., the jury submitted question number four, seeking clarification of CALCRIM No. 1800.  The question read, "The [j]ury would like the judge's clarification on [CALCRIM No.] 1800--specific[ly] the question is what the 'law' is versus a store policy.  Do you have to leave the store or go past the doors to commit petty theft or not?"  After discussing the question with counsel, the court reread the instruction defining the elements of petty theft.

On the second day of deliberations, at 9:47 a.m., Juror No. 11 submitted a question number 5.  It read as follows:  "1800.  [¶]  Regarding [Q]uestions 1, 2, 3, 4[,] we would like them reworded.  Due to confusion[*sic*].  [¶]  Is the definition of took steal[*sic*][?]"  The court prepared the following answer, "The question is confusing because it is unclear whether the question is referring to the [four] prior [j]ury questions submitted to this [c]ourt or to the [four] elements of petty theft as defined in [CALCRIM No.] 1800.  [¶]  Assuming that your question is asking for re-wording of the elements of petty theft as they are defined in [CALCRIM No.] 1800, we cannot re-define further for you the elements of the crime."

That afternoon the jury submitted two more questions.  Question number six asked for a read back of some of the testimony.  Specifically, the jury was interested in the testimony of Williams, Daniel, and Scarbrough "from both direct [and] cross on the events from the time . . . Daniel[] attempted to detain [Scarbrough] until [Scarbrough] was running through the open lots."  The trial court granted the request and the jury reheard the testimony.

Question number seven requested the following:  "A working laptop in order to view the [Walmart] camera footage without being in the courtroom.  Also [r]ead

back of . . . Lee['s] testimony, as well as Johnson['s] testimony[.] Without the laptop there will be NO CONSENSUS AT ALL EVER in this lifetime–HELP[.]" The court granted both requests.

Later that afternoon, the trial court stated the bailiff had forwarded a message from the jury indicating they were unable to reach a verdict. The foreperson, Juror No. 7, stated the jury had reached a verdict on two counts and there were five counts remaining. In the courtroom, the trial court questioned the foreperson and when it asked if the jury could arrive at a verdict if allowed to continue deliberations, Juror No. 7 replied, "No, not with the current composition of this jury." The court next asked about the numeric breakdown for each count. Juror No. 7 stated, "11 to 1 on every one of those five counts." When questioned if any juror was refusing to deliberate, Juror No. 7 said there was one juror who was participating but who also "questioned the way the law is written, has attempted to bring in perceptions, and is using a knowledge not based on the instructions given to us to justify that juror's position."

The court asked the foreperson if there was anything that could be clarified or additional instructions that would help with the deliberation process. Juror No. 7 responded, "There may be. If you can make it very clear that the fruits of a poison tree do not apply and that . . . whether or not a violation of the 4th Amendment [r]ights occurred, . . . does not change the actual facts in evidence[.] [T]hat might be able to bring us to a decision about four counts."

Outside the presence of the jury, the court discussed Juror No. 7's statements. The prosecutor stated that without knowing more details it appeared there was a juror who was refusing to follow the law. The prosecutor said it appeared the juror was bringing his or her understanding of the 4th Amendment into deliberations and the instructions. The prosecutor noted search and seizure issues and suppression motions are matters of law that must be decided by the court, not the jury. Defense counsel countered that the hold out juror should not be replaced because the foreperson did not say the juror

9

was not participating in deliberations or not following the law, but rather there appeared to be "a difference of opinion regarding the facts." Counsel reminded the trial court the section 69 instructions stated the officers must be in "lawful performance of their duties," which meant not engaging in excessive force. Counsel stated the 4th Amendment issues raised by the foreperson may refer to that element of section 69. In such a case, the juror would be following the law. In addition, the jury was told to use their common sense, which would include their outside perceptions and experiences.

After a brief recess and a conference in chambers, the court stated it had drafted a special instruction to give the jury. Over defense counsel's objection, the court told the jury, "Ladies and Gentlemen, in your deliberations, none of you are to discuss or mention, in any way, the topics of the 4th Amendment to the United States Constitution and whether or not it applies to this case, any discussion about . . . 'fruit of the poisonous tree,' . . . [or] 'search or seizure[.]' Those are legal issues exclusively decided by the judge, not the jury. If any such discussion has already taken place regarding those issues, you are to completely ignore those prior discussions in your deliberations. [¶] As we mentioned repeatedly in this case, you are here exclusively to decide the facts of this case, which means what happened in this case, and apply the law as I have given it to you in the jury instructions you already have to those facts." The jury continued deliberations.

The following morning, Juror No. 11 submitted question eight, asking if more instructions would be given regarding an executive officer's performance of his or her lawful duties. The juror's question also asked, "Can we use [Scarbrough's] statement of mental [health] issues . . . [?]" The court responded in writing, stating, "There are no additional jury instructions that we can give at this time. Please re-refer back to the jury instructions you have already been given. [¶] Please specifically re-read instructions 223, 252, 2651, 2656, and 2670."

10

Soon thereafter, the jury submitted question nine. It stated, "The [j]ury has collectively determined [and] concluded that Juror [No.] 11 does not possess the capability or understanding to follow jury instructions by applying the law as it has been given to us. Due to this lack of understanding[,] we all feel further deliberations will not ever be conclusive to reaching resolution on multiple charges."

Juror No. 11 submitted a letter to the judge, stating, "[M]y understanding of the instructions [is] to hear the evidence of the witnesses . . . use my common sense, my experiences and to way [*sic*] if the witnesses are credible. [¶] At this time I feel I am being harassed by the panel for not changing my vote on my verdict. [¶] According to the panel I am not following the law because I won't chance [*sic*] my vote to side with them and they want a unanimous vote. This is why I feel harassed. [¶] I have read 2670 and according to the evidence I heard by all witnesses I voted. So the charges that presided [sic] I voted the same way. [¶] As for the other questions I sent you regarding the mental issues and the definition of took wear [*sic*] for me to help deliberate [*sic*] to the panel. [¶] If you so please give me a reason to why [*sic*] I am not following the rules. Or if I am following the rules. [¶] Also I'd like to report that the for[e]man is influencing the jury by saying[,] 'it is petty theft to go into an establishment and walk around with it concealed or not until you pay for it, that's the law[.]' [E]veryone has agreed with the foreman, but me."

The trial court determined it must question each juror separately about the issues raised by question number nine and Juror No. 11's letter. It asked each juror several questions about Juror No. 11's efforts to deliberate, follow instructions, and possible bias.

Seven jurors (Juror Nos. 3, 4, 5, 7, 8, 10 & 12) opined Juror No. 11 was refusing to deliberate. Juror No. 7 reached this conclusion after seeing Juror No. 11 refuse to speak or explain her thought process. When Juror No. 7 asked her to explain

11

her position, Juror No. 11 would reply, "I don't have to" and "No. It's my right not to talk."

Juror No. 7 also saw that when the jury members were deliberating on an issue, Juror No. 11 would be disengaged and appeared to be reading instructions or her notes. She would say "I'm not listening." This pattern of behavior was confirmed by Juror Nos. 2, 3, 4, 8, 10 & 12. Juror No. 3 recalled, "[I]t depends on what we're discussing. She will not interact with us, and . . . when asked certain questions, she avoids them and starts speaking of something else." When asked about the frequency of this conduct, Juror No. 3 replied, "That happens every other minute" and "[s]he's in, I would say, her own little bubble." Juror No. 10 opined, "[S]he's obviously not participating in the conversation, paying attention and then when you ask a question, the response you get has absolutely nothing to do with the topic that you're trying to talk through." Juror No. 10 stated this occurred regularly during deliberations. Juror No. 12 described Juror No. 11's habit of disengaging as follows: "Sometimes it seems like she zones out and goes into her own little world, kind of zones us out."

Eight jurors (Juror Nos. 1, 2, 3, 5, 8, 9, 10 & 12) stated Juror No. 11 refused to follow various jury instructions during deliberations. For example, Juror No. 1 explained Juror No. 11 added elements and words to the legal requirements of certain crimes, such as saying an intent was needed. Juror No. 1 stated, "[T]here are parts [of the instruction] that do state intent, but she applies it to all throughout the whole discussion of, did this happen, yes or no? [Juror No. 11 would bring up w]ell, there was no intent, or his intent was this; therefore, and we're just trying to say, did this happen?" When asked if there was a particular instruction Juror No. 11 did not understand, Juror No. 1 replied, "She hasn't . . . verbally said, I don't understand or I don't comprehend. There have been times when we have sat in discussions, and she seems willing to discuss and talk about it, but then it comes—it always falls back to what I believe is her inability to read the law, read the instructions and . . . follow them." When Juror No. 3 was asked this same

12

question, Juror No. 3 indicated Juror No. 11 was refusing to follow or disregarding "[a]ll of them[]" because "[s]he doesn't believe what's written." Juror No. 3 recalled hearing Juror No. 11 say she would not follow the instructions "until I get them—basically asking, as you've seen, them to be reworded." The juror clarified, "She will not follow them until they are reworded, rewritten . . . ." It appears Juror No. 3 was referring to Juror No. 11's question number four asking the trial court to reword the instructions and define the word "took" (a word used in CALCRIM No. 1800 regarding petty theft).

Similarly, Juror No. 2 recalled Juror No. 11 refused to accept the definitions contained in the instructions, she added elements to the offenses and discussed matters that did not apply or "make any sense." Juror No. 2 opined, "[Juror No. 11] refuses to accept the definitions that are given to us by the law in our instructions. She has a hard time understanding that for some reason, comprehending. We tried to go about it in several different ways to try to get her to understand. It just seems she can't comprehend or follow." Juror No. 5 commented that Juror No. 11 did not like the way the jury instructions were written because she "reads words into things that aren't even there. She will read a sentence, and she adds words into the sentence that aren't even there." Juror No. 5 clarified Juror No. 11 wanted additional requirements added to the instructions. When asked what instruction Juror No 11 was refusing to follow, Juror No. 5 stated, "Well almost any of the instructions that you've given us, she's questioning them, thinks they need to be rewritten."

All 11 jurors testified Juror No. 11 violated the court's special instruction by either implicitly or explicitly discussing the 4th Amendment or related topics such as "violations of Scarbrough's rights." They agreed she stopped using the exact terms listed in the special instruction, but she returned to the topic of rights being violated as a reason supporting her verdict. When the foreperson reminded her the topic was off limits, Juror No. 11 accused the foreperson of intimidating her.

13

Nine jurors (Juror Nos. 2, 3, 4, 6, 7, 8, 9, 10 & 12) testified Juror No. 11 was unable to deliberate fairly because of a personal bias based on her previous experience of being allegedly unlawfully detained by law enforcement. For example, Juror No. 6 stated Juror No. 11 could not put aside her prior experience with law enforcement. Juror No. 2 recalled Juror No. 11 believed that due to a "mall security incident" law enforcement "can't be trusted." Juror No. 10 opined Juror No. 11 brought up her biases in an indirect way and was not doing it "purposefully" but because "she is unable to detach." Similarly Juror No. 12. believed Juror No. 11 could not put her personal bias aside.

The other two jurors did not use the word bias but discussed how Juror No. 11's deliberations were colored by her past experiences. Juror No. 1 noted Juror No. 11 shared personal experiences regarding a prior detention and Juror No. 1 believed it impacted her decision-making ability. Juror No. 1 disagreed with Juror No. 11's claim the past was not affecting her decision based "on the fact that she [kept] going back to . . . the 4th Amendment, and even after your special instructions, she kept going back to the 4th Amendment that, yes, I . . . really do feel like it's a struggle for her." Similarly, although Juror No. 5 did not find evidence of bias, this juror recalled Juror No. 11 referred to personal experiences and seemed to base her decision on them.

Juror No. 11 denied failing to follow the instructions, including the special instruction. She stated she was deliberating with the other jurors but they did not agree with her position. She stated, "I've continually told them what my reasoning is, and they want me to give more reasoning, and I don't have any more reasoning." Juror No. 11 said she brought up issues related to the 4th Amendment after receiving the special instruction only in the context of "excessive force from my understanding of the evidence." Juror No. 11 stated she believed she understood the instruction but "my interpretation is different." When asked why she submitted questions for the trial court

14

seeking further explanation, Juror No. 11 explained, "It was to deliberate with them, so that they can see my view."

Juror No. 11 denied having a personal bias and her discussion of her experiences with law enforcement did not mean she was biased. She stated, "It was to help explain my point of view on certain things." When asked if she was unlawfully detained by law enforcement, she replied, "No." She said something bad once happened to her in a store. Then she added, "I was trying to define what I thought the elements meant, and I told them [about an incident when] one of my kids [was] younger. Two of my boys and three of the neighborhood boys had gotten into trouble for doing something. [¶] They told me that charges of this were because they had exited the store, and I said, this is what this means, because they exited the store. It doesn't mean walking around the store." The court questioned Juror No. 11 further about the incident involving her children. Juror No. 11 stated, "The little one was outside the location. He's the one that got in trouble." She stated they were not charged with theft and law enforcement did not become involved because she paid for "whatever it was" and she promised they would not go in the store again without her. Juror No. 11 denied saying law enforcement generally cannot be trusted. She clarified, "What I said was that I didn't find what they said credible."

Juror No. 11 claimed the other jury members only read the "bold-type part" of the instructions and she was not given an opportunity to read the jury instructions until the third day. Because this last point was a new accusation, the court separately questioned the jury foreperson about the jury's access to the instructions. Juror No. 7 stated the packet was passed out to anyone who was interested and there were copies left in the middle of the table.

After hearing argument from counsel, the trial court ruled that good cause existed to discharge Juror No. 11. The court determined Juror No. 11 failed to follow the jury instructions, including the special instruction. It noted the jurors, almost

15

unanimously, recalled Juror No. 11 added or rephrased words and added concepts "such as, the police officer violated [Scarbrough's] 4th Amendment right and, therefore, everything after was unlawful." The court decided Juror No. 11 refused to deliberate by declining to answer questions from fellow panelists, failing to listen to the deliberations, and refusing to explain her reasoning when others asked her about it. Additionally, the court concluded Juror No. 11 had a disqualifying personal bias involving law enforcement that she could not put aside during deliberations. The court rejected defense counsel's objection to the special instruction, concluding the jury instructions sufficiently defined lawful performance of duty as applied to sections 69 and 148. The trial court stated, "Those are fully and completely defined in the jury instructions." The trial court discharged Juror No. 11 and seated an alternate juror.

In his briefing on appeal, Scarbrough maintains the above evidence was insufficient to support dismissal of Juror No. 11 for the following reasons: (1) there was evidence the juror was actively deliberating by asking the trial court questions and seeking clarification; (2) the juror wanted the others to understand her different viewpoint but she was being harassed; and (3) the juror did not willfully intend to disregard instructions or intentionally conceal a bias against law enforcement. He discusses the court's various reasons for dismissal as being unrelated to each other and much of his argument is based on selecting snippets of the juror's statements favorable to Juror No. 11 and ignoring the weight of evidence to the contrary.

The trial court recognized and commented that the 11 jurors brought up "the same topics over and over again." Although stated in different ways, the jurors conveyed their belief Juror No. 11 was having difficulty deliberating and accepting the instructions as written because her thought process was deeply tainted by a personal bias. "Bias is often intertwined with a failure or refusal to deliberate. 'A juror who is actually biased is unable to perform the duty to fairly deliberate and thus is subject to discharge. [Citations.]' [Citations.] 'A refusal to deliberate consists of a juror's unwillingness to

16

engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury.' [Citation.]" (*People v. Lomax* (2010) 49 Cal.4th 530, 589.)

The record shows Juror No. 11 was initially fully engaged in the deliberation process. She expressed her views, told stories about her personal experiences, viewed videotapes, and asked questions. It appears that when it became clear to Juror No. 11 that the other jurors interpreted and applied the instructions differently, she stopped listening to their discussions, refused to discuss her position, and turned to the trial court for assistance in helping her rewrite or "clarify" the instructions to better reflect her own viewpoint. Although Juror No. 11 did not physically separate herself from the jury, the jurors said they became aware she was no longer willing to consider other points of view. They described her as being tuned out, in her "own little bubble," and "zoning out." The court found credible the opinions of seven jurors who concluded Juror No. 11 was no longer deliberating with them. Based on this record we are satisfied Juror No. 11's refusal to deliberate was established to a "demonstrable reality." The totality of the evidence supports the trial court's conclusion Juror No. 11 was not just having difficulty expressing her viewpoint or merely viewed the evidence differently than the others. She was ignoring the deliberations, being uncooperative, and settled on a particular decision based on what the other jurors recognized as an impermissible personal bias.

In his discussion, Scarbrough does not acknowledge there was a shift during the deliberations. He infers Juror No. 11's questions to the court meant she was aware of the issues and therefore was listening to the other jurors although she appeared disengaged. This inference is not reasonable in light of the evidence Juror No. 11

17

submitted those questions because she wanted the instruction reworded to better support her perception of what the law should be. Juror No. 11's candidly admitted to the court that she submitted questions "so that they can see my view." The trial court reasonably inferred Juror No. 11 understood the instructions did not accurately reflect her viewpoint and she was hoping they could be rewritten to change the minds of the other jurors.

Scarbrough suggests Juror No. 11's conduct can be blamed on the harassment she received from other jury members. He asserts Juror No. 11 likely stopped deliberating because she was being unduly pressured by the others to reach a unanimous verdict. The court considered and rejected this theory based on the facts gathered from the other jurors. The court noted the jurors said they asked Juror No. 11 questions and asked for help understanding her viewpoint but did not harass or unduly pressure her. Scarbrough cites to evidence from which it can be inferred the jury was frustrated with Juror No. 11. We agree there is evidence of frustration. However, it would be speculative to conclude the frustration resulted in harassment. To the contrary, there was evidence the jurors handled their frustration by trying different deliberation approaches and finally turning to the trial court for help. For example, Juror No. 10 described how the members of the jury tried different approaches and the situation "weigh[ed] heavily on all of us." The court asked Juror No. 10 several times if anyone was trying to put pressure on Juror No. 11, and Juror No. 10 unequivocally responded "No." Juror No. 10 explained the jurors asked Juror No. 11 several times to help them understand her viewpoint and she refused. Juror No. 10 said, "Had there been frustration in the room, absolutely. No one tried to push her into a decision. We've tried very, very hard to understand, and when we felt bias was coming into play or a law that was not part of the laws we were given, we stopped, and we say, we cannot look at that; that is not the instructions we were given."

As for bias, the majority of jurors agreed Juror No. 11's deliberations were tainted by her personal bias based on her previous experience with law enforcement.

18

Several jurors commented she was unable to put her personal bias aside during deliberations. Although two of the jurors did not use the word "bias" they agreed Juror No. 11's viewpoint was significantly impacted by her prior experiences. The trial court did not find credible Juror No. 11's statement she had not remembered during voir dire the incident involving her children at the store when she was asked questions about personal experiences with law enforcement and personal biases. Juror No. 11's statement she was merely sharing prior experiences conflicted with the other juror's recollections. For example, Juror No. 2 stated Juror No. 11 said law enforcement could not be trusted due to a prior mall security incident.

There are many cases holding "a bias against law enforcement that renders a juror unable to fairly weigh police testimony is grounds for the juror's replacement." (*Barnwell, supra*, 41 Cal.4th at p. 1051; *People v. Feagin* (1995) 34 Cal.App.4th 1427 (*Feagin*).) In *Barnwell*, jurors reported that "Juror R.D." had a bias against law enforcement officers. (*Barnwell*, *supra,* 41 Cal.4th at p. 1048.) Although Juror R.D. said he simply disbelieved the officers who testified, nine other jurors testified Juror R.D. expressed a general bias against police officers, while the testimony of two jurors was inconclusive. (*Id.* at p. 1049.) The court concluded Juror R.D.'s disqualifying bias was a "demonstrable reality." (*Id*. at p. 1053.)

Similarly in the *Feagin* case, the trial court removed "Juror Perdue" for bias against police officers. (*Feagin, supra*, 34 Cal.App.4th at p. 1437.) During interviews of the jurors, the trial court heard a majority say Juror Perdue would not participate in discussions and had brought up police racial bias, referring to the Rodney King case. (*Ibid*.) The ruling was upheld on appeal: "We find substantial evidence in the record to support the finding that Juror Perdue was unable to perform her functions as a juror . . . in that she had prejudged the credibility of the police officers who had testified at trial and was unable to cast aside her personal bias in weighing the evidence. (*Ibid*; see also *People v. Thomas* (1990) 218 Cal.App.3d 1477, 1485 [majority of jurors reported Juror

19

Williams believed Los Angeles police officers generally lie based on personal experience].)

Looking at the totality of the evidence in this case, we conclude the trial court relied on evidence that amply supported its conclusion there was good cause to remove Juror No. 11. After conducting a lengthy inquiry, the trial court gave detailed reasons for discharging Juror No. 11. We find no abuse of discretion because the record reflects a demonstrable reality Juror No. 11 was unable to perform her duties because she refused to deliberate, disagreed with the jury instruction that did not reflect her biased viewpoint, and harbored a disqualifying personal bias.

III

The judgment is affirmed.

O'LEARY, P. J.

WE CONCUR:

FYBEL, J.

IKOLA, J.

20