Filed 1/18/22  P. v. Smith CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D077614 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS304942) |
| RICKEY VERNON SMITH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Garry Haehnle, Judge.  Affirmed.

Benjamin Kington, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Natasha A. Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Rickey Vernon Smith guilty of second-degree murder (Pen. Code, § 187, subd. (a))[1] and found true an allegation that he personally used a deadly and dangerous weapon (a knife) (§ 12022, subd. (b)(1)). The trial court sentenced Smith to a prison term of 16 years to life.

Smith contends (1) the trial court abused its discretion by excluding evidence about the victim's history of aggression or violence pursuant to Evidence Code section 352; and (2) the trial court erred in denying Smith's post-trial motion to obtain personal identifying information for the jurors to investigate possible instances of juror misconduct. We conclude that Smith's arguments lack merit, and we accordingly affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

On the morning of November 27, 2018, around 9:00 a.m., Smith and the eventual victim, Horace Williams, were both traveling southbound on Sweetwater Road in Chula Vista toward the Willow Street bridge. Smith was driving a pickup truck, and Williams was driving a minivan. Because the bridge was under construction, there was only one lane of traffic in each direction over the bridge.

As Williams and other motorists waited at a red traffic light before going over the bridge, Smith pulled into the opposing lane of traffic, speeding past the waiting vehicles. Smith drove through the intersection against a red light and crossed the bridge. Smith then got into the left turn lane at the next intersection, which was the intersection of Willow Street and Bonita Road. While Smith waited in the left turn lane for the traffic light to change, Williams pulled up to the right side of Smith's truck, preparing to make a

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

2

right turn onto Bonita Road.  Witnesses saw Williams throw a paper object at the passenger side door area of Smith's truck as he passed by, such as a fast food wrapper or fast food napkins.  Williams then made a right hand turn onto Bonita Road.

Smith pulled out of the left turn lane and pursued Williams's minivan by making a right turn on Bonita Road.  While being followed by Smith's truck, Williams made a U-turn on Bonita Road.  Smith continued to pursue Williams by also making a U-turn.  Both vehicles then turned left from Bonita Road back onto Willow Street toward the bridge.

Witnesses saw Smith's truck bump the back of Williams's minivan multiple times as the two men drove across the bridge.  Smith then pulled into the opposing traffic lane so that he was next to the driver's side of Williams's minivan.  One witness observed Smith making angry comments to Williams while he drove next to Williams's minivan.  As Smith pulled forward, Williams threw a McDonald's soda cup at Smith's truck, which hit the rear of the truck and splattered soda on it.

Smith then cut in front of Williams's minivan as they reached the red light at the intersection on the other side of the bridge.  Witnesses saw Williams's minivan collide with the back of Smith's truck.  Smith exited his truck and walked to the driver's side window of Williams's minivan.  Witnesses described Smith as looking angry and argumentative.

Smith proceeded to punch Williams several times through the minivan's open driver's side window, with his body leaning into the minivan.  At some point, Williams's door may have opened slightly, but it is not clear whether it was Smith or Williams who was trying to open the door.  Witnesses did not see Williams direct any punches toward Smith.

3

Smith then reached for a pocketknife that he kept in a belt holster. Smith opened the knife and stabbed Williams seven times while Williams was still sitting in the minivan. Two of the stab wounds were to Williams's left chest. Witnesses described Smith as inflicting the stab wounds in a forceful manner. One of the stab wounds penetrated Williams's heart, leading to his death. The other five stab wounds were to Williams's extremities: one wound to his left forearm, one wound to the palm of his left hand, and three wounds to his left leg. The leg wounds were consistent with witness accounts that after the stabbing was already underway, Williams stuck his leg out of the window. Because of the tinted windows on Williams's minivan, witnesses were not able to see Williams's movements inside the minivan during the incident.

After Smith stopped stabbing Williams and stepped aside, Williams exited the minivan. Williams was bloody and stumbled around, trying to tell fellow motorists to call 911 while also attempting to make his own phone call for help. Williams eventually fell to the ground and could not get up. People at the scene attempted to offer aid but soon determined that Williams was no longer breathing and did not have a pulse.

Meanwhile, Smith also called 911 while standing near the front of his truck. Smith told the operator that he was the person who stabbed Williams, that Williams cut him off and threw a drink on his truck for no reason, and that he stabbed Williams after Williams punched him. Smith cooperated with police when they arrived and gave them the pocketknife used in the stabbing.

Williams was taken to the hospital, where he was pronounced dead. No weapons were found in Williams's minivan. Smith was charged with murder

(§ 187, subd. (a)), with the further allegation that he used a deadly and dangerous weapon (a knife) (§ 12022, subd. (b)(1)).

Smith testified at trial that the altercation with Williams started shortly after they exited the freeway when Williams made an insulting gesture to him and repeatedly cut in front of his truck. According to Smith, he ran the red light at the Willow Street bridge because he was trying to get away from Williams. However, after Williams threw something at his truck at the intersection of Bonita Road, Smith decided to pursue Williams to get information from Williams in case there was damage to his truck. Smith testified that he never bumped into the back of Williams's minivan.

Further, according to Smith, when he got out of his truck and went to speak to Williams, he was not angry and was not expecting a fight. As Smith testified, Williams was the initial aggressor as they interacted face to face at the window of the minivan because Williams insulted him and then reached out of the window and twice punched Smith in the forehead. Smith also explained that he took out his knife only because he saw Williams reaching for something inside the minivan that he thought might be a gun. According to Smith, he did not intentionally stab Williams, but rather he held his knife near the window in self-defense while Williams lunged forward several times and repeatedly drove the knife into his own body.

The jury found Smith not guilty of first degree murder, but it convicted him of second degree murder and made a true finding that he used a deadly and dangerous weapon (a knife). The trial court sentenced Smith to a prison term of 16 years to life.

## II.

## DISCUSSION

A.  *The Trial Court Did Not Abuse Its Discretion By Excluding Evidence of Workplace Conduct Suggesting That Williams Had an Aggressive or Violent Character*

We first consider Smith's contention that the trial court abused its discretion by relying on Evidence Code section 352 to exclude testimony that Williams's actions at work suggested he had an aggressive and violent character.

### 1.  *Applicable Legal Standards*

Before turning to the specific evidence that the trial court excluded, we review the provisions of the Evidence Code that govern the issue.  Evidence Code section 1101, subdivision (a) generally provides that "evidence of a person's character . . . is inadmissible when offered to prove his or her conduct on a specified occasion."  However, Evidence Code section 1103, subdivision (a) sets forth an exception that is relevant here:  "In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by [Evidence Code] Section 1101 if the evidence is:  [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character."  (Evid. Code, § 1103, subd. (a).)  The parties do not dispute that the evidence Smith proposed to present regarding Williams's aggressive and violent character falls within the scope of evidence made admissible by Evidence Code section 1103, subdivision (a)(1).

Under Evidence Code section 1103, subdivision (b), when a court admits evidence of a victim's character for violence, evidence regarding the defendant's character for violence also becomes admissible.  As stated in that

6

provision, "In a criminal action, evidence of the defendant's character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) is not made inadmissible by [Evidence Code] Section 1101 if the evidence is offered by the prosecution to prove conduct of the defendant in conformity with the character or trait of character and is offered after evidence that the victim had a character for violence or a trait of character tending to show violence has been adduced by the defendant under paragraph (1) of subdivision (a)." "In other words, if . . . a defendant offers evidence to establish that the victim was a violent person, thereby inviting the jury to infer that the victim acted violently during the events in question, then the prosecution is permitted to introduce evidence demonstrating that . . . the defendant was a violent person, from which the jury might infer it was the defendant who acted violently." (*People v. Fuiava* (2012) 53 Cal.4th 622, 696.)

The admission of all such evidence is nevertheless subject to Evidence Code section 352, under which "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Id.*; see also *People v. Gutierrez* (2009) 45 Cal.4th 789, 827-828 [evidence admissible under Evid. Code § 1103, subd. (a), may be excluded based on Evid. Code § 352 in the trial court's discretion].) In applying section 352, the trial court enjoys " 'broad discretion,' " and " '[a] trial court's discretionary ruling under . . . section 352 will not be disturbed on appeal absent an abuse of discretion.' " (*People v. Clark* (2016) 63 Cal.4th 522, 586.) " ' "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court

7

exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" ' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 26.)

2.      *The Trial Court's Exclusion of the Evidence Proffered by Smith*

During motions in limine, defense counsel sought a ruling pursuant to Evidence Code section 1103, subdivision (a)(1), allowing the testimony of witnesses who would describe past instances of aggressive or violent behavior by Williams at work. Specifically, Smith's motion in limine identified two possible witnesses.

First, the motion in limine stated, "[L.H.] previously employed [Williams] as a salesman at [H.] Auto Sales. [L.H.] was 'not surprised' to learn of [Williams's] involvement in a road rage incident ending in a physical confrontation given his tendency to intimidate and threaten others. [L.H.] described [Williams] as having a 'Jekyll and Hyde' personality where he could be normal and polite one moment, but become aggressive and threatening the next. [L.H.] recalls [Williams] repeatedly attempting to intimidate his coworkers with his size and by saying he was proficient in martial arts in order to get sales commissions that he had not personally earned. [Williams] often bragged that his 'hands were registered,' a relatively common phrase for referring to one's hands as lethal weapons. [L.H.] last saw [Williams] as recently as a few months before his death, when [Williams] returned to [L.H.] asking for employment again. However, because [L.H.] had so many problems with [Williams] becoming combative in the workplace previously, he declined to rehire him." As stated in a subsequent brief filed in support of the motion, L.H. would testify that "[Williams], on countless occasions,

8

warned that no one should 'mess with him' and that he would 'hate to have to hurt someone.'"[2]

Second, the motion in limine set forth a vague and extremely brief description of prior fistfights engaged in by Williams. Specifically, the motion stated, "[M.C.G.] has been personally engaged in a fistfight with [Williams], as has his cousin in an entirely separate incident." During the multiple hearings on defense counsel's request to admit the evidence of Williams's character, defense counsel focused almost exclusively on obtaining leave to offer the proposed testimony of L.H. He only once mentioned the fistfight incident involving M.C.G. During that single instance, the following exchange occurred:

> "[DEFENSE COUNSEL]: Even above that [i.e., L.H.'s testimony], we have individuals who [he] actually fought with, and he physically attacked, and they fist fought.
>
> "THE COURT: Who?

---

[2] In their motion in limine to exclude the character evidence relating to Williams, the People provided their own description of the interviews that the People and defense counsel conducted of L.H. "[L.H.] is the owner of [H.] Auto Sales and employed Mr. Williams two different times, once for six months in 2016 and the second time for about three months in 2017. [L.H.] said that Mr. Williams was a 'good family man,' but was 'different' at work. [L.H.] said that Mr. Williams was never physical with other employees but was verbally aggressive and confrontational with them at times. According to [L.H.], Mr. Williams told coworkers that he was a 'martial artist' and that they should 'leave him alone.' [¶] The defense investigator interviewed [L.H.] as well. In that interview, [L.H.] said that although Mr. Williams had never been confrontational with him, he stated Mr. Williams was verbally aggressive with coworkers about the sales commission that he felt entitled to receive and there were some situations where he had to get between Mr. Williams and the other employee. [L.H.], however, confirmed that the auto sales business was competitive and that Mr. Williams'[s] aggressiveness with fellow employees was regarding obtaining commission."

"[DEFENSE COUNSEL]: [M.C.G.], who is on our witness list.

"THE COURT: He fist fought—there was an actual fistfight?

"[DEFENSE COUNSEL]: Yes. Mr. Williams attacked him. They actually got into a physical fistfight."

As the proponent of the evidence, it was defense counsel's burden to make an adequate offer of proof. (*People v. Morrison* (2004) 34 Cal.4th 698, 724.) The bare statement that Williams engaged in two fistfights at some point in his life, in an unspecified context, is not sufficient to show that Williams had a character for violence and may have acted in conformity with that character when he interacted with Smith.[3] Because defense counsel failed to make a more specific offer of proof as to the details of M.C.G.'s proposed testimony, he did not lay the necessary foundation to establish that the trial court abused its discretion in excluding M.C.G.'s testimony or that any such error was prejudicial. We therefore focus our analysis on the proposed testimony of L.H., which was described in adequate detail.

In their own in limine briefing, the People explained that if the trial court granted Smith's motion to admit testimony relating to Williams's aggressive and violent character, the People would seek to present evidence to establish Smith's own aggressive and violent character. The People proposed to present evidence of several incidents at Smith's workplace:

---

[3] In searching for clues as to the possible details of the fistfights described by M.C.G., we note that throughout the multiple hearings at which the trial court considered defense counsel's request to admit evidence of Williams's character for aggression and violence, the trial court consistently assumed that only *work-related* incidents involving Williams were at issue. Although given ample opportunity, defense counsel did not dispute the trial court's statement that the incidents were solely work related, even when the trial court relied upon that fact as one of the grounds for its ruling denying the motion in limine.

"1. **December 23, 1999 and March 2, 2000:** [Smith] was terminated from FedEx because on December 23, 1999, he shouted profanities at a coworker who was attempting to give him instructions, and on March 2, 2000 when he shout[ed] profanities and 'displayed blatant disrespect' to a coworker who was trying to give him instructional information.

"2. **July 28, 2018:** [Smith], while working at TransDev . . . , confronted [J.M.] and accused him of driving his vehicle. [Smith] stated to [J.M.,] 'Don't be taking my vehicle. This is my vehicle.' [J.M.] reported that [Smith] said this in a threatening manner before [Smith] punched him in the ribs twice. [J.M.] immediately told [Smith] to stop. [Smith] stopped, but again stated 'Don't be taking my vehicle.' [J.M.] suggested that they speak with their supervisor, [R.A.]. [Smith] said, 'I don't give a fuck what [R.A.] says' and added, '[L]et's go outside to the parking lot.' At that moment, [J.M.] walked away and went to [R.A.'s] office to report what happened. Later that afternoon, [R.A.] met with [Smith]. During their meeting, [R.A.] asked [Smith] if he had 'punched [J.M.] in the ribs' and [Smith] said 'Yes.' [R.A.] told [Smith] that he would be placed on administrative leave pending an investigation, but [Smith] immediately stood up and tried to leave. [R.A.] told him that he needed his written statement before he could leave. [Smith] said, 'No, I'm suspended' and walked away despite [R.A.] telling him not to.

"3. **March 16, 2016:** [Smith] met with [B.L.] and [A.R.], two of his supervisors, to discuss instructions given to [Smith] that he had failed to follow. During the meeting, he became argumentative and pointed his finger at [B.L.] and called [A.R.] a liar. [Smith] came around the table and confronted [B.L.] in a threatening manner. Due to his behavior, [Smith] was escorted out of the building.

"4. **August 9, 2018:** [J.F.], [Smith's] coworker at FedEx, said that when they were sorting packages, [Smith] turned to their team leader and screamed 'Tell this motherfucker to get off the sort.' [J.F.] asked [Smith], 'Who are you calling a motherfucker?' before [Smith] walked away. [J.F.] felt disrespected and reported the incident to his manager and said that [Smith] had an anger management problem. [J.F.] asked to be separated from [Smith].

[J.F.] said that his manager informed him they had received other complaints against [Smith] in the past. When the People spoke with [J.F.], he informed us that 'He [[Smith]] was kind of like a keg of dynamite, he can just set off like that right away.' "

Defense counsel's in limine briefing made clear that Smith did not intend to let the People's proposed evidence go unchallenged. Defense counsel explained that if the People were permitted to introduce evidence of the workplace incidents involving Smith, the defense would seek to present evidence to challenge the accuracy of how the People's witnesses described those incidents. Defense counsel explained that as to the incident involving Smith punching his coworker J.M. in the ribs and the incident involving threatening his supervisor B.L., the "underlying facts of each allegation remain as hotly contested now as they were at the time. . . . [¶] Moreover, their introduction at . . . trial would result in an exorbitant consumption of extra time and judicial resources. These incidents cannot be viewed in a vacuum; in order to properly defend against each of these allegations of prior 'bad acts,' the defense in turn would need to call several additional witnesses to offer context and the bigger picture. The need to re-litigate these accusations will undoubtedly result in a 'trial within a trial,' while simultaneously confusing the jury and wasting the court's time."[4] Defense counsel also disputed whether Smith's behavior toward his coworker at FedEx, J.F., could reasonably be described as "aggressive," and explained that "admitting this evidence would necessarily require the defense to introduce its own witnesses that were present at the time—witnesses that

---

[4]     For example, as to the incident in which Smith allegedly punched J.M. in the ribs, defense counsel explained that the evidence would show that Smith merely "poked" J.M. in the stomach in a joking manner. In addition, defense counsel stated that "for every witness that they have that says something happened, we have witnesses that say it didn't happen."

were never concerned by Mr. Smith's demeanor or behavior that day, let alone heard Mr. Smith make any aggressive remarks."

After extensive argument from counsel on the issue, the court ruled that it would exclude the evidence of Williams's character pursuant to its discretion under Evidence Code section 352. As the trial court explained, it would cause an undue consumption of time and "a trial within a trial" if the jury heard testimony about the aggressive and violent character of Williams because the People would then be permitted to present the evidence they proposed regarding the aggressive and violent character of Smith, which Smith disputed. Further, the trial court explained that the evidence was minimally relevant because it related to conduct in the workplace, and the jury might be confused by being asked to determine the ancillary issue of how Williams and Smith acted in the workplace.

> "[T]he only bad act evidence or bad character evidence that you [defense counsel] have supplied the Court is through [Williams's] work. And if I look at the People's evidence of what they want to bring in as bad act evidence [it] is also from [Smith's] actions at his work. And we are not here to try a case to determine who was the worst person at work when they were with other employees. That is not what we are here for. That is not what the jury is here for. I think it would confuse the jury, lead to— lead to issues that the jury would not be able to figure out on their own. I don't know that we can properly instruct them on how to consider that evidence. It would be a trial within a trial, and I think it would be a waste of the Court's time and trouble which would lead to really nothing leading to assist either the People or the defense in this case because—and the jury would have to make a decision, okay, who was the worst guy at work. And that is not what they have—that is not what they are here to judge today in this trial. They are here to judge what happened on that day and that time."

As the trial court later summarized, "it would be an undue consumption of time and we end up having a trial within a trial on who the worst person at

13

work is, whether Mr. Smith is an aggressor at work and whether Mr. Williams is an aggressor at work. And that is not a decision that this jury should make during the course of this trial. Neither are they called to make that decision. And that would be a trial within a trial, thus an undue consumption of time within this case, and I think the limited probative value that would show is far outweighed by any prejudice."[5]

3. *The Trial Court Did Not Abuse Its Discretion By Excluding the Evidence Proffered by Smith*

Smith contends that the trial court improperly excluded the evidence regarding Williams's character. According to Smith, the excluded evidence was highly relevant because it would have supported Smith's contention that Williams was the initial aggressor when Smith walked up to the driver's side window of Williams's minivan. As Smith explains, evidence that Williams was the initial aggressor was important to his defense because Smith testified that due to Williams's aggressive behavior, he formed the belief that he had to defend himself, leading him to use his knife against Williams.

In assessing whether the trial court abused its discretion in excluding the evidence, we note that the trial court's ruling was based on two fundamental premises: (1) the evidence that the defense proposed to present

---

[5] Later in the trial, at the beginning of the defense case, the court returned to the issue. It stated, "And I just want to make another record, too, as to the character evidence that was . . . offered by [defense counsel] and then by the People as well under [Evidence Code section] 1103. I continued to think about the ruling on that case and what has been going on with this trial, and . . . I have not seen anything to cause me to change my ruling on that request for the evidence based on either . . . the victim or the defendant's propensity for alleged bad character at work. . . . I am still very comfortable with the ruling I made." Finally, after Smith testified at trial, defense counsel asked once again that evidence of Williams's character be admitted. The trial court stated it saw no reason to change its ruling.

14

was of minimal relevance because it involved Williams's aggressive behavior at work rather than an instance similar to the road rage incident between Williams and Smith; and (2) in light of the minimal relevance of the evidence, it would involve an undue consumption of time and confuse the jury to have a "trial within a trial" on the issue of whether Williams and Smith were aggressive and violent at work. As we will explain, the trial court's reasoning was sound and did not constitute an abuse of discretion.

As to the first premise, the trial court had a reasonable basis for concluding that the proposed testimony of L.H. was only minimally relevant to prove that Williams had a character for committing the type of violence that Smith contends Williams displayed during the road rage incident at issue in this case. The incidents that L.H. described did not involve physical violence. Instead, they involved aggressive and intimidating verbal statements. Moreover, as the trial court pointed out, the incidents were limited to Williams's workplace and his competitive relationships with coworkers.

As to the second premise, the trial court had a sound basis for concluding that it would consume a significant amount of time and would lead to a trial within a trial if the parties were permitted to litigate the issue of whether Williams and Smith were aggressive and violent at work. Although the evidence involving Williams's workplace behavior would be limited to L.H.'s testimony (and possibly the vaguely described testimony from M.C.G.), the People proposed to present evidence about several different incidents involving Smith. Although Smith claims on appeal that the trial court could have limited the People's evidence to reduce the consumption of time, defense counsel's own statements demonstrate why that approach was not practical. As we have explained, defense counsel told the trial court that

15

he would put on evidence to dispute the People's characterization of Smith's behavior at work. The trial court therefore reasonably concluded that a time consuming trial within a trial would result if it admitted evidence about Williams's and Smith's character for aggression or violence in the workplace.

In light of the minimal relevance of the evidence and the significant amount of time that would be required to litigate Williams's and Smith's workplace conduct, the trial court was well within its discretion to deny Smith's motion in limine. (Cf. *People v. Hamilton* (2009) 45 Cal.4th 863, 930 [trial court did not abuse its discretion under Evid. Code, § 352 by excluding evidence with limited probative value that "would have required 'a mini-trial' "].) Further, as the trial court reasonably concluded, admitting evidence of Smith's and Williams's workplace conduct would unnecessarily confuse the issues by focusing the jury on the question of which man was the more aggressive person at work. (Evid. Code, § 352 [identifying the substantial danger of "confusing the issues" as one consideration in deciding to exclude evidence].)

Smith relies primarily on two cases to support his contention that the trial court abused its discretion. (*People v. Castain* (1981) 122 Cal.App.3d 138; *Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938.) Both cases involve a trial court's improper exclusion of evidence under Evidence Code section 352 of a police officer's past acts of excessive force when that evidence would have served as circumstantial evidence that the officer also used excessive force in the case at issue. We find *Castain* and *Andrews* to be inapposite. In both cases, the evidence of the past use of excessive force by the officers was highly probative of the central disputed issue. (*Castain*, at p. 143; *Andrews*, at p. 948.) Here, in contrast, Williams's verbal aggression at work was not highly probative of whether he was the

16

physical aggressor in the incident with Smith. Moreover, unlike the case in Smith's trial, where numerous instances of workplace conduct were at issue with several witnesses, in *Castain* there was no risk of a significant consumption of time because only two brief witnesses would have testified. (*Castain*, at p. 143.)

In sum, we conclude that Smith has not established that the trial court prejudicially abused its discretion in excluding the proposed evidence about Williams's character for aggression or violence.

B.   *The Trial Court Properly Denied Smith's Post-Trial Motion to Obtain Juror Identifying Information*

Next, we consider Smith's contention that the trial court abused its discretion by denying his motion to obtain the jurors' personal identifying information to investigate whether juror misconduct had occurred, which he would use to support a motion for a new trial. (See § 1181 [a motion for a new trial may be granted when the jury has "been guilty of any misconduct by which a fair and due consideration of the case has been prevented"].)

1.   *The Trial Court Twice Denied Smith's Request for Juror Identifying Information*

On November 8, 2019, less than a month after trial, Smith filed a motion to obtain personal identifying information for the jurors. In support of the motion, defense counsel submitted a declaration attaching an email he recently received from the prosecutor. The email stated, "A fellow [deputy district attorney] shared that a friend heard that an African American juror said during deliberations in the Smith case something to the effect of 'I can't do it.' On the day of the verdict however, the African American juror came into deliberations and said something like she imagined her son in the same position and thereafter the jury was able to reach a verdict. [¶] In addition, fellow [deputy district attorney] Patrick McGrath reached out to let me know

17

that juror #11 reached out to him (they know one another from the Navy) after the verdict to comment on the professional prosecution presentation."

The People's opposition memorandum to the motion identified an additional fact that was not included in defense counsel's declaration in support of Smith's motion. Specifically, "the People also learned from an intern in the South Bay Office that his mother knew one of the jurors. This juror told the intern's mother that during deliberations, an African-American juror did not want to convict because she felt that African-American men are overrepresented in the prison population."[6]

At a hearing on November 21, 2019, the trial court denied the motion without prejudice.

On December 9, 2019, Smith filed a renewed motion to obtain the jurors' personal identifying information. The motion explained that the People had disclosed the names and contact information of the individuals referenced in the prosecutor's email, and the defense had conducted two relevant interviews.

First, according to the defense investigator's declaration, he spoke to a man, R.T., who stated that he spoke to a friend who may have been one of the jurors at Smith's trial and who told him about the conduct of a fellow juror. The investigator's declaration stated:

"5.     The friend/juror told [R.T.] that one of his fellow jurors (who he did not name) refused to participate in deliberations.

"6.     The friend/juror told [R.T.] that she was refusing to 'listen to anything' going on during jury deliberations.

---

6     Smith is African American.

"7. The friend/juror told [R.T.] that after several days, the other jurors were prepared to ask the judge to declare a mistrial due to her refusal to participate in deliberations with them.

"8. The friend/juror told [R.T.] that one morning, the juror arrived prepared to render a verdict."

Second, according to a report provided by the defense investigator to defense counsel, the investigator spoke with two people who were together when they spoke to a friend who was one of Smith's jurors. According to the investigator's report, both people described the friend as saying that "during the trial deliberations another (unnamed female) juror had stated that she didn't think that Smith deserved the punishment for his actions because he was [B]lack and that there were already too many [B]lack men in jail." (Capitalization omitted.)

Defense counsel argued that based on this information, Smith had made a prima facie case to support release of juror identifying information because "[r]efusing to deliberate with the rest of the jury constitutes jury misconduct."

The trial court denied the renewed motion. In so doing, the trial court noted the timeline of the jury's deliberations. Specifically, at the end of the second full day of deliberations, after the court had responded to the jury's questions about implied malice, jurors informed the bailiff that they were at an impasse. The jurors were told to prepare a note and send it to the court the next morning. The jurors arrived the next morning and within 20 minutes reported that they had reached a verdict. In denying the motion, the trial court stated that based on this timeline, the juror who reportedly refused to deliberate eventually did participate in deliberations because the jury was able to reach a verdict. Therefore, Smith had failed to make a prima facie case of possible juror misconduct based on refusal to deliberate.

19

Further, the trial court stated that although it was not the "overriding" ground for its decision, the defense had also failed to show that it could not contact the jurors using other resources, such as by following up with the people who were interviewed, or by using the internet.

2.    *The Trial Court Did Not Prejudicially Abuse Its Discretion in Denying the Motion for Release of Juror Identifying Information*

On appeal, Smith contends that the trial court should have allowed him to obtain juror identifying information to investigate two possible instances of juror misconduct: (1) possible misconduct by Juror No. 11 in failing to disclose his acquaintance with Deputy District Attorney Patrick McGrath, whom he contacted after the verdict to compliment the prosecution's professionalism during the trial; and (2) possible misconduct by the juror who reportedly failed to deliberate.

The law governing juror identifying information is set forth in the Code of Civil Procedure. As applicable here, the law provides that after the recordation of a jury's verdict in a criminal jury proceeding, the court's record is sealed, with all personal identifying information of trial jurors removed from the court record. (Code Civ. Proc., § 237, subd. (a)(2)-(3).) Under Code of Civil Procedure section 206, subdivision (g), "a defendant or defendant's counsel may . . . petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." (*Ibid.*)

Code of Civil Procedure section 237, subdivision (b) sets forth the standard by which a petition for release of juror information is evaluated. "The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information. The court shall set the matter for hearing if the petition and

20

supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information, but shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure. A compelling interest includes, but is not limited to, protecting jurors from threats or danger of physical harm." (*Ibid.*)

To demonstrate good cause, a defendant must make a sufficient showing that "talking to the jurors is reasonably likely to produce admissible evidence of juror misconduct." (*People v. Johnson* (2013) 222 Cal.App.4th 486, 493 (*Johnson*); see also *People v. Cook* (2015) 236 Cal.App.4th 341, 345 (*Cook*) ["Good cause, in the context of a petition for disclosure to support a motion for a new trial based on juror misconduct, requires 'a sufficient showing to support a reasonable belief that jury misconduct occurred.'"].) "Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported." (*Cook*, at p. 346.)

If the trial court decides that the petitioning party has made a prima facie showing of good cause for the release of the juror identifying information, and there is no other compelling interest against disclosure, jurors are given notice of the proposed release of information and an opportunity to protest, and a hearing is held to determine whether to release the information. (Code Civ. Proc., § 237, subds. (b), (c).) "We review an order on a motion for disclosure of jurors' identifying information under the deferential abuse of discretion standard." (*Johnson*, *supra*, 222 Cal.App.4th at p. 492.)

Smith first argues that the trial court abused its discretion in denying the motion to release juror identifying information because its ruling was based, in part, on the fact that defense counsel had failed to show that it

21

could not obtain the juror identifying information through other means. As Smith correctly points out, case authority holds that under Code of Civil Procedure section 237, a party seeking juror identifying information is not required to have made an independent attempt to obtain that information as a precondition of obtaining release of the information from the court. (*Johnson, supra*, 222 Cal.App.4th at p. 497 ["Because the Legislature provided that jurors' identifying information must be sealed, we conclude it did not intend to require a defendant to show diligent efforts to obtain the sealed information as a condition of unsealing it."].)

We nevertheless conclude that the trial court did not prejudicially err by commenting on whether defense counsel made diligent attempts to contact the jurors through other means. Specifically, the trial court's ruling did not depend on that consideration. At the hearing on the renewed motion, after the trial court stated that it *could* deny the motion because defense counsel had not shown he was unable to obtain the juror information on his own, defense counsel represented to the trial court that he *did* make an effort to obtain the information but was unsuccessful. The trial court then clarified that its ruling was not based on whether or not counsel made an effort to obtain the information. The trial court explained, "more overridingly, . . . the issue is that, to this Court's mind, that [the jurors] were able to reach verdicts." This comment establishes that the trial court based its ruling on the fact that all of the jurors ended up participating in deliberations, not on the fact that defense counsel could have been more diligent in trying to contact the jurors.

Smith also challenges the trial court's ruling by arguing he established a prima facie case of good cause to obtain the juror identifying information. As we will explain, because Smith did not identify any possible juror

misconduct, the trial court did not abuse its discretion in concluding that Smith failed to make a prima facie case of good cause for the release of the information.

First, Smith argues that he established good cause to obtain juror identifying information to investigate whether Juror No. 11 committed misconduct by failing to disclose that he knew a deputy district attorney from their service in the Navy. Smith based his argument on the principle that "[a] juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct." (*In re Hitchings* (1993) 6 Cal.4th 97, 111.)[7]

Smith's argument fails because the jurors were not asked during voir dire whether they *knew* any attorneys. Instead, jurors were asked a much more limited question: "[D]o you yourself *or anyone close to you* ha[ve] any legal training, experience or employment that includes attorneys, judges, court reporters, court clerks, or paralegals?" (Italics added.) Based on that question, Juror No. 11 did not conceal anything or give a false answer by failing to disclose that he was acquainted with a deputy district attorney with whom he served in the Navy. A past coworker from the Navy would not normally be described as someone "close to you." (Cf. *People v. Tuggles* (2009) 179 Cal.App.4th 339, 373 [when asked whether a "close friend" had been accused of any offense, a juror did not commit misconduct when she failed to identify a person she barely knew]; *People v. Duran* (1996) 50 Cal.App.4th 103, 107, 114-115 [when asked whether a person "close" to her had been the victim of a violent crime, a juror did not commit misconduct by failing to

---

7    We note, however, that " 'an honest mistake on voir dire cannot disturb a judgment in the absence of proof that the juror's wrong or incomplete answer hid the juror's actual bias.' " (*People v. Merriman* (2014) 60 Cal.4th 1, 97.)

identify a casual acquaintance].) In addition, although the subject of the District Attorney's office came up during voir dire, the jurors were not asked whether they knew any *attorneys* who worked for the district attorney's office. Instead, they were asked, "Have you or to your knowledge any relative, close friend, or anybody you have a significant personal relationship with had any law enforcement training or experience, been a member of or been employed by any law enforcement agencies? And . . . when I talk about law enforcement agency, we talk about the police department, the sheriff's office, the highway patrol, *an investigator for either the district attorney's office*, the city attorney's office, the attorney general's office, the United States attorney's office, or with the FBI, border patrol or any other law enforcement agency." (Italics added.) Juror No. 11 could not have committed misconduct by failing to disclose his acquaintance with the deputy district attorney in response to this question, as a deputy district attorney is not employed as "an *investigator* for . . . the district attorney's office." (Italics added.) In sum, because Juror No. 11 did not fail to disclose any information asked of him during voir dire, Smith cannot make a sufficient showing that "talking to the jurors is reasonably likely to produce admissible evidence of juror misconduct." (*Johnson, supra*, 222 Cal.App.4th at p. 493.)

Second, defense counsel argued that he would be able to develop evidence of juror misconduct if he was able to contact the juror who reportedly failed to deliberate. Although he does not cite any case law in which a motion for a new trial was granted based on a juror's refusal to deliberate, Smith nevertheless contends that refusal to deliberate constitutes juror misconduct because case law holds that "proper grounds for *removing* a deliberating juror include refusal to deliberate." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485, italics added; see also *People v. Bowers* (2001) 87

24

Cal.App.4th 722, 732; *People v. Feagin* (1995) 34 Cal.App.4th 1427, 1437.) Smith apparently views that case law as support for the proposition that even when the jury *does* end up reaching a verdict, a juror who has refused to participate at some point during deliberations has committed the type of misconduct that may be used to support a motion for a new trial. We reject Smith's interpretation of the case law.

As our Supreme Court has explained, a trial court's inquiry into possibly removing a juror for refusal to deliberate " 'should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists.' " (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1054.) Here, exactly that situation occurred. Even if one of Smith's jurors may have originally refused to engage in deliberations, the juror *did* end up participating, and the jury *was* able to reach a verdict. Because all of Smith's jurors plainly did engage in deliberations at some point in the process, Smith would be unable to make " 'a sufficient showing to support a reasonable belief that jury misconduct occurred,' " even if he was granted access to juror identifying information. (*Cook, supra,* 236 Cal.App.4th at p. 345.)

We conclude that because Smith was not able to make a prima facie showing of good cause, the trial court did not abuse its discretion by denying Smith's motion to obtain the release of juror identifying information.

## DISPOSITION

The judgment is affirmed.


IRION, J.

WE CONCUR:



O'ROURKE, Acting P. J.



GUERRERO, J.